# DECLARATION OF ACHILLE ONORATO AS FOREIGN REPRESENTATIVE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 15

MOBY S.P.A.,                                        Case No. 22-10311

Debtor in a Foreign Proceeding.
_____/


**DECLARATION OF ACHILLE ONORATO AS FOREIGN REPRESENTATIVE OF MOBY S.P.A. PURSUANT TO BANKRUPTCY CODE SECTION 1515 IN SUPPORT OF (I) VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND MOTION FOR ORDER GRANTING RELATED RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 1515, 1517, 1520 AND 1521; AND (II) MOTION OF FOREIGN REPRESENTATIVE FOR PROVISIONAL RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 1519(a) AND 362(a)**

## DECLARATION OF ACHILLE ONORATO

I, Achille Onorato, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am a resident of Italy, am over the age of 18, have personal knowledge of the following facts, and am competent to testify as to the following facts.

2.      I, Achille Onorato, in my capacity as Foreign Representative (the "Foreign Representative") of Moby S.p.A. ("Moby") in the Italian *concordato preventivo* pending before the *Tribunale di Milano, Sezione II Civile, Fallimentare* (the "Italian Bankruptcy Court") under matter number 48/2020 R.G. C.P. (the "Italian Insolvency Proceeding"), hereby submits this declaration (the "Declaration") in support of (a) my verified petition (the "Verified Petition"), for entries of orders (i) recognizing the Italian Insolvency Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"); (ii) confirming relief pursuant to section 1520; and (iii) granting interim relief pursuant to Bankruptcy Code sections 105(a), 1507(a); and 1521; and (b) the motion for entry of orders granting (i) provisional relief pursuant to Bankruptcy Code sections 1519(a) and 362(a) (the "Provisional Relief Motion").  This Declaration refers to chapter 15 of the Bankruptcy Code (11 U.S.C. §§ 1501–1532) as "Chapter 15" and to the proceedings resulting from the Verified Petitions as the "Chapter 15 Proceedings."

### Appointment as Foreign Representative

3.      Prior to the Italian Insolvency Proceeding and presently during this period of restructuring, I serve as a Vice Chairman of Moby's Board of Directors. I have been working for Moby since September 2009.  I have joined the Board of Directors and been appointed as a Vice Chairman in July 2015.  I also serve as the Chief Executive Officer of Moby since April 2016.  I am the Foreign Representative of Moby in connection with the company's restructuring efforts.

4.      The Board of Directors is comprised of five members.  On August 30, 2021, the Board of Directors appointed me as the duly authorized foreign representative of Moby in relation to the Italian Insolvency Proceeding pursuant to article 160 of Royal Decree No. 267/1942 (the "Italian Bankruptcy Law").  A copy of my appointment is attached as **Exhibit A**.

5.      On July 9, 2020, the Italian Bankruptcy Court entered an order commencing the Italian Insolvency Proceeding for Moby (the "Commencement Order").  A copy of the Commencement Order is attached as **Exhibit B**.

6.      On June 24, 2021, the Italian Bankruptcy Court entered an order admitting Moby to the Italian Insolvency Proceeding – i.e., the Court authorized Moby to proceed to the next stages of the Italian Insolvency Proceeding as set forth in Italian Bankruptcy Law (the "Admission Order"). A copy of the Admission Order is attached as **Exhibit C**.

7.      Pursuant to the Italian Bankruptcy Law, all actions against Moby have been stayed by an automatic, mandatory stay similar to the automatic stay of section 362 of the Bankruptcy Code. The stay under Italian Bankruptcy Law remains in place until the Italian Bankruptcy Court approves Moby's restructuring plan and that plan goes into effect.

8.      In connection with the Italian Insolvency Proceeding, Moby's Board of Directors authorized the filing of the Verified Petition.  A copy of the Moby's Secretary's Certificate of Board Resolutions is attached as Exhibit A.

## Overview of Moby

9.      Moby is a part of a group of companies ("Moby Group" or the "Group") that operate a successful Italian ferry and cruise business with routes in both the Mediterranean Sea and the Baltic Sea.

10. Moby and its main subsidiary, Compagnia Italiana di Navigazione S.p.A. ("CIN," and together with Moby, the "Italian Debtors"), account for the majority of Moby Group's operations.

11. In its ferry and cruise business, Moby Group transports passengers and freight in the Mediterranean Sea, where it connects mainland Italy with Mediterranean islands (including Sardinia, Sicily and Malta).

12. The Moby Group also (i) fully manages the port of Olbia in Sardinia; and (ii) provides other limited port services (*e.g.*, passenger ticketing) in several other Italian cities, such as Livorno (on the coast of Tuscany) and Catania (the second largest city in Sicily).

13. Moby Group's fleet—composed of 48 vessels and 16 tugboats—is one of the most modern and largest fleets in Europe. The fleet of vessels represents the largest fleet of passenger, bed, and vehicle capacity worldwide. Prior to the COVID-19 pandemic, Moby Group's fleet had a market value of approximately €1 billion, including vessels belonging to Moby that had a market value estimated at approximately €450 million.

14. The Italian national and regional governments provide Moby Group with subsidies (totaling approximately €87 million per year) to operate certain routes considered to be in the public interest throughout the year and, in particular, during the low season (*i.e.*, from October to March, when fewer tourists use the ferries than from April through September).

15. Moby's center of main interest is Italy, where Moby's senior management reside and work. Most of Moby's cash management occurs in Italy. Similarly, most of Moby's employees and assets reside in Italy. Moby's operations are growing, however. As part of its initiative to grow its ferry operations, Moby Group expanded its ferry business from the Mediterranean Sea to the Baltic Sea, where it launched cruises with ports of call in Russia (St. Petersburg), Estonia (Tallinn), Sweden (Stockholm) and Finland (Helsinki).

16.     Moby Group has enjoyed an exceptional reputation in the maritime industry.  For instance, in 2016 and 2017, the Moby Group won the Italian Travel Awards (a leading tourism award) for the quality of the daily service offered on board its ferries.  Similarly, in 2018, the German Quality & Finance Institution praised Moby, as it had done four previous times, for offering its customers the best service among ferry carriers.  In January 2019, Moby became a member of the exclusive "Club of Superbrands," which includes companies that have generated significant innovation in their respective business sectors.

## Capital Structure

17.     In February 2016, to extinguish prior debt of approximately €429.2 million, Moby obtained €560 million in financing through a combination of a credit facility (€260 million) and a bond issuance (€300 million).  First, Moby obtained (i) a €200 million loan requiring annual payments (the "Term Loan") from a consortium of eight U.S. and non-U.S. banks (the "Lenders"),[1] and (ii) a €60 million revolving credit facility maturing 2021 provided by five of the Lenders[2] (the "Revolving Facility").

18.     Both the Term Loan and the Revolving Facility are governed by the terms of the Senior Facilities Agreement (the "Credit Agreement").  The Credit Agreement is governed by English law, and the courts of England have exclusive jurisdiction over disputes related to it.[3]

---

[1]     The Lenders were as follows:  (i) UniCredit S.p.A. ("UniCredit"); (ii) JP Morgan Securities PLC ("JP Morgan Securities"); (iii) Goldman Sachs International ("GSI"); (iv) Banca IMI S.p.A. ("Banca IMI"); (v) Banca Popolare di Milano S.c. a r.l. ("BPM"); (vi) Monte dei Paschi di Siena S.p.A. ("Monte dei Paschi"); (vii) Unione di Banche Italiane S.p.A. ("UBI"); and (viii) Banco Popolare Società Cooperativa ("Banco Popolare").

[2]     In total, (i) UniCredit agreed to fund Moby and related entities with €65 million; (ii) Banca IMI with €65 million; (iii) BPM with €50 million; (iv) Monte dei Paschi with €39 million; (v) UBI with €15 million; (vi) Banco Popolare with €15 million; (vii) JP Morgan Securities with €5.5 million; and (viii) GSI with €5.5 million.

[3]     *See* Sections 45 and 46.1 of the Credit Agreement.

Pursuant to section 9.1 of the Credit Agreement, the Term Loan must be repaid, in five annual installments, by February 2021 (the "Installments").[4]

19.      During the same time period, Onorato Armatori S.p.A. (which later merged into Moby) issued bonds in accordance with an indenture dated February 11, 2016 ("Indenture") in the amount of €300 million.[5]  The bonds bear interest of 7.75% per year payable in two semi-annual payments in February and August, mature in February 2023, and trade on the Luxembourg Stock Exchange (the "Bonds").

20.      The Indenture designates the state and federal courts of Manhattan as having non-exclusive jurisdiction of disputes arising under the Indenture. Under the terms of the Indenture, Moby designated an agent in New York, NY.

21.      The Bonds and the Credit Agreement are secured by a collateral package, including (i) ship mortgages over vessels belonging to Moby and CIN; and (ii) pledges of shares of Moby and CIN as well as certain of their bank accounts (the "Collateral").

## Restructuring Efforts

22.      Despite its success, in the recent years, Moby Group's profitability decreased because of: (i) an increased competition for the Sardinian and Sicilian ferry routes; (ii) expenses associated with Moby Group's expansion in the Mediterranean Sea and the Baltic Sea; and (iii) increased costs, including fuel costs and other port-related expenses.

---

[4]   Each installment is due in February of each of the five years between 2017 and 2021, with the schedule of payments as follows: (i) €10 million due in the first year (February 2017); (ii) €40 million due in the second year (February 2018); (iii) €50 million due in the third year (February 2019); (iv) €50 million due in the fourth year (February 2020); and (v) €50 million due in the fifth year (February 2021).  *See* Section 9.1(a) of the Credit Facilities Agreement.

[5]   Section 4.20 of the Indenture required the merger of Onorato Armatori S.p.A. into Moby within 180 days of the issue date for the Bonds.

23.    In late 2019 and early 2020, Moby became the target of an involuntary bankruptcy proceeding in Italy.  The Italian Bankruptcy Court dismissed the involuntary proceeding because Moby, despite its financial difficulties, remained a solvent company.

24.    In early 2020, the COVID-19 pandemic exacerbated Moby Group's financial situation.  The company's cruise and ferry businesses suffered a stiff decrease in ticket sale revenues.

25.    Between late 2019 and the first half of 2020, Moby negotiated a potential debt restructuring with certain creditors of Moby Group, including creditors that had filed the involuntary bankruptcy petition in Italy.

26.    Despite the progress of creditor negotiations, certain creditors continued to threaten Moby Group's business continuity.  Thus, on June 30, 2020, Moby and CIN each filed a separate application for judicial restructuring (each, an "Application").

27.    Upon filing of such Applications,  pursuant to Italian Bankruptcy Law, Moby and CIN's creditors have been automatically stayed.  The prohibition on starting or continuing any enforcement or foreclosure proceedings over Moby and CIN's assets by creditors is effective as of July 1, 2020 for as long as their respective insolvency proceedings are pending.

28.    The insolvency proceeding initiated by Moby and CIN in Italy—termed a "*concordato preventivo*"—is a court-supervised proceeding under Italian Bankruptcy Law.  This court proceeding seeks to foster an agreement between the debtor and its creditors based on (i) a proposal made by the debtor to the creditors for the repayment of its indebtedness (the "Concordato Proposal"); and (ii) a related plan detailing how debts would be restructured or discharged (the "Concordato Plan").  The Concordato Proposal and related Concordato Plan are filed with the competent Italian bankruptcy court.

29.     The Italian Bankruptcy Court accepted the Italian Debtors' Applications on July 9, 2020, authorizing Moby and CIN to each file a Concordato Proposal and related Concordato Plan.

30.     On March 29, 2021, Moby filed its Concordato Proposal and related Concordato Plan with the Italian Bankruptcy Court.  CIN filed its Concordato Proposal and Concordato Plan on May 24, 2021.

31.     On June 24, 2021, the Italian Bankruptcy Court entered an order admitting Moby to the Italian Insolvency Proceeding.  This Admission Order authorizes Moby to proceed to the next stages of the Italian Insolvency Proceeding.   The same day, the Italian Bankruptcy Court entered a similar order for CIN.

32.     On September 21, 2021, Moby and CIN entered into a confidential, non-binding memorandum of understanding ("MOU") with an ad hoc group of bondholders that holds more than 33% of the outstanding principal of the bonds.  Pursuant to the MOU, the Moby Group and the ad hoc group of bondholders will continue negotiations with the objective of, among other things, obtaining additional financing in support of a restructuring plan to submit to the Moby Group creditors.  The parties entered the MOU under the assumption, and are negotiating under the condition, that Moby files for Chapter 15 in the United States.

33.     To allow for an expeditious and effective commercial restructuring in the Italian Insolvency Proceeding, including efforts to enforce all rights and obligations under the Indenture and other agreements, Moby now seeks the protections afforded by Chapter 15.

## **Property Located in the United States**

34.     Most of Moby's property is located in and around the Mediterranean Sea and the Baltic Sea.  The Indenture, however, represents a crucial contract between Moby and the Lenders,

including a U.S.-based Trustee. The Indenture designates New York as the governing law and the venue for any proceedings arising out of its terms.

35.     The below list summarizes Moby's key United States contracts.

    a.  The Indenture;

    b.  Numerous other collaboration and supply contracts.

36.     Moby has also paid a cash retainer to Quinn Emanuel Urquhart & Sullivan, LLP in connection with this case, and maintains an interest in the unearned portion of these retainer funds, which are maintained in a U.S. bank account at City National Bank, Miami, Florida.

WHEREFORE, I respectfully request that this Court enter an Order substantially in the form of the proposed Order attached as Appendix A to the Verified Petitions, as well as afford any other relief as may be just and proper.

Dated:  January 14th, 2022
Milan, Italy

                                                    /s/ Achille Onorato
                                            _____
                                            Achille Onorato,
                                            Foreign Representative of Moby S.p.A

**MOBY S.p.A.**
**CERTIFICATO DEL SEGRETARIO DEL CONSIGLIO DI AMMINISTRAZIONE**

Il sottoscritto, Avv. Marco Russo, avente agito quale Segretario del Consiglio di amministrazione ("CdA") di Moby S.p.A. ("Moby") nel corso della riunione del CdA tenutasi in data 30 agosto 2021, certifica che, nel corso della detta riunione, il CdA di Moby ha regomalrmente adottato le seguenti deliberazioni, le quali sono in vigore ed efficaci:

*Il Consiglio di Amministrazione, tenuto conto dell'informativa dell'Amministratore Delegato e di tutti i chiarimenti dallo stesso forniti, dopo esauriente discussione, all'unanimità,*

***delibera***

*• Di depositare istanza di riconoscimento di procedimento straniero ai sensi del Capitolo 15, del Titolo 11, del Codice Fallimentare degli Stati Uniti d'America presso il tribunale fallimentare degli Stati Uniti per il Distretto Meridionale della Florida.*

*• Di nominare il Dottor Achille Onorato, nella sua qualità di Amministratore Delegato, quale "foreign representative" (così come definito nel Codice Fallimentare U.S.A.) nell'ambito dell'istanza di cui al punto precedente, conferendo allo stesso tutti i poteri commisurati a tale nomina.*

*• Di dare mandato allo Studio Legale Quinn Emanuel Urquhart & Sullivan, LLP affinchè provveda al deposito dell'istanza ed a tutte le attività successive e ad essa connesse.*

IN FEDE, ho apposto la presente firma a mio nome il giorno 10 settembre 2021.

Nome: Marco Russo
Titolo: Segretario del Consiglio di
amministrazione

**EXHIBIT**

**Onorato A-1**

**MOBY S.p.A.**
**BOARD OF DIRECTORS SECRETARY'S CERTIFICATE**

The undersigned, Mr. Marco Russo,  having acted as Secretary of the Board of Directors ("Board") of Moby S.p.A. ("Moby") during the Board meeting held on August 30, 2021, hereby certifies that, during said meeting, Moby's Board duly adopted the following resolutions, which continue to be in full force and effect:

*The Board of Directors, taking into account the information provided by the Chief Executive Officer and all the clarifications provided by him, after a full discussion, unanimously,*

*resolves*

*• To file a petition for recognition of foreign proceeding under Chapter 15, Title 11, of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Florida.*

*• To appoint Mr. Achille Onorato, in his capacity as CEO, as a "foreign representative" (as defined in the U.S. Bankruptcy Code) in connection with the petition referred to in the previous paragraph, giving him all the powers commensurate with that appointment.*

*• To give mandate to the Law Firm Quinn Emanuel Urquhart & Sullivan, LLP to file the petition and to pursue all subsequent and related activities.*

---

IN WITNESS WHEREOF, I have hereunto signed my name this 10th day of September, 2021.

[signature]
Name: Marco Russo
Title:   Secretary of the Board of
           Directors

EXHIBIT
Onorato A-2



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK            )
                             )                    ss:
COUNTY of NEW YORK           )

### ***CERTIFICATE OF ACCURACY***

This is to certify that the attached document "Moby S.p.A. – Certificato del Segretario del Consiglio di amministrazione"-- originally written in *Italian* -- is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: 9/10/2021                          Sworn to and signed before ME
                                          This 10th day of September, 2021

*Susannah Smith*                          *James G Mamera*
Susannah Smith                            Notary Public
Project Manager
Consortra Translations



JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

Your
legal
translation
partner

New York, NY | Washington DC | Houston, TX | San Francisco, CA | Hong Kong



# Tribunale di Milano
## Sezione II civile
## Fallimentare

riunita in camera di consiglio nelle persone dei signori
Dott. Alida Paluchowski                    Presidente
Dott. Guendalina Pascale                   Giudice
Dott. Vincenza Agnese                      Giudice relatore
ha pronunciato il seguente

<div style="border:1px solid black; text-align:center">

**DECRETO**
**EX ART. 161, COMMA VI, L.F.**

</div>

VISTO il ricorso rubricato al n. 48/2020 R.G. C.P. con cui la società MOBY S.P.A. [C.F 04846130633] ha proposto una domanda *ex* art. 161, comma 6, l.fall., riservandosi di presentare entro un assegnando termine una proposta definitiva di concordato preventivo (con il piano e la documentazione di cui ai commi secondo e terzo di tale norma) o una domanda di omologa di accordi di ristrutturazione dei debiti;

PRESO ATTO che la Cancelleria ha provveduto tempestivamente a chiedere la pubblicazione della domanda nel Registro delle imprese e l'ha trasmessa al PM in sede, e che la ricorrente ha prodotto i bilanci depositati relativi agli anni 2016, 2017 e 2018, rappresentando che è in corso di redazione il bilancio al 31.12.2019 e ha altresì prodotto un'aggiornata visura camerale;

## RITENUTO

- che da tale documentazione emerga la sussistenza del presupposto soggettivo di fallibilità e di quello oggettivo della ricorrenza di uno stato di crisi richiesti per l'accesso alle procedure di concordato preventivo e/o di omologa di accordi di ristrutturazione dei debiti;

- che sussista ai sensi degli artt. 3 e 4 regolamento UE 848 del 2015 la giurisdizione e competenza di questo Tribunale in quanto il COMI dell'impresa è situato in Italia, dal momento che la sede legale dell'impresa è situata in **Milano**, e non ricorrono elementi per localizzare una eventuale sede diversa;

- che la presente costituisca quale procedura principale ai sensi dell'art. 3, comma 1, Regolamento UE 848 del 2015;

- che sia stata altresì dimostrata la sussistenza dei poteri dell'organo amministrativo ai fini della proposizione della domanda;

- che possa dunque accogliersi la richiesta di concessione di termine, da fissare in concreto, alla luce del tenore della domanda e di quanto emergente dalla documentazione allegata, in 120 giorni decorrenti dal deposito della domanda (cfr. Cass. n. 29740/18);

- che la complessità della procedura alla luce degli elementi versati in atti e la concreta situazione patrimoniale e finanziaria emergente dalla documentazione contabile prodotta (cfr. bilancio al 31.12.2018) consigliano di disporre sin da ora nomina di due commissari giudiziali ai sensi dell'art. 161, comma 6, come modificato dal D.L. n. 69/2013, con la conseguente fissazione di una cauzione per le spese di procedura;

Firmato Da: PALUCHOWSKI ALIDA Emesso Da: INFOCERT FIRMA QUALIFICATA 2 Serial# 5b7e4e

Firmato Da: AGNESE VINCENZA Emesso Da: INFOCERT FIRMA QUALIFICATA 2 Serial# 6abb52 - Firmato Da: INFOCERT FIRMA QUALIFICATA 2 Serial# 6abb52

<div style="border:2px solid black; text-align:center">

**EXHIBIT**

**Onorato B-1**

</div>



exhibitsticker.com

 **TRIBUNALE DI MILANO – SEZIONE II CIVILE**

- che vadano disposti gli specifici obblighi informativi periodici di cui al comma 8 della citata disposizione, per brevità indicati direttamente in dispositivo;
- che non ricorrano i presupposti per procedere alla riunione al presente procedimento del procedimento n. 49/2020 (domanda di concordato ex art. 161, comma 6, l.fall. proposta da COMPAGNIA ITALIANA DI NAVIGAZIONE S.P.A.) non prevedendo il nostro ordinamento l'istituto della riunione delle procedure concorsuali né potendosi anticipatamente applicare –indipendentemente dall'accertamento dei relativi presupposti- le norme del d.lgs n. 14/19 sul concordato di gruppo in quanto non ancora vigenti;
- che non possa sin da ora essere autorizzato il compimento di atti urgenti di straordinaria amministrazione neppure entro una soglia determinata, dovendo il Tribunale eseguire una valutazione caso per caso, sentiti previamente i Commissari, mentre la società potrà naturalmente compiere gli atti rientranti nella ordinaria amministrazione come parametrati alla dimensione della società (es. acquisto del carburante);

**P.Q.M.**

Visto l'art. 161, commi 6 e 8, l.fall.;

1. **CONCEDE** alla società ricorrente **termine fino al 28/10/2020** per la presentazione di una proposta definitiva di concordato preventivo (con il piano e la documentazione completa di cui ai commi secondo e terzo di tale norma) o di una domanda di omologa di accordi di ristrutturazione dei debiti;

2. **NOMINA** i **commissari giudiziali** nelle persone di:

**dr. Vincenzo MASCIELLO e avv. Maurizio ORLANDO**

i quali dovranno vigilare sull'attività che la società ricorrente andrà a compiere fino alla scadenza del suddetto termine, riferendo immediatamente al Tribunale ogni fatto costituente violazione degli obblighi di cui agli artt. 161 e 173 l.fall. e degli altri obblighi sottoindicati; e provvederanno a depositare, dopo il deposito di piano e proposta definitivi, un proprio parere sulle possibili criticità tecniche (con esclusione dei profili di fattibilità economica) di piano e proposta;

3. **DISPONE** che la ricorrente:
3.1. entro il termine di **dieci giorni** dall'avvenuta comunicazione del presente decreto depositi una **aggiornata situazione patrimoniale**;
3.2. entro il termine di **quindici giorni** dall'avvenuta comunicazione del presente decreto **depositi la somma** di **€ 150.000,00** presumibilmente necessaria per effettuare il pagamento del compenso dovuto ai commissari giudiziali e per sostenere le altre eventuali spese del procedimento, effettuando il relativo versamento su un conto corrente intestato alla procedura da aprire presso la banca **Ubi Banca S.p.a.**;

3.3. allo scadere

| del 30/07/2020 |
| del 31/08/2020 |
| del 30/09/2020 |

nonché, **nel caso di richiesta di proroga del termine, contestualmente alla richiesta stessa** deposit i in cancelleria una **situazione finanziaria aggiornata** dell'impresa (**che la Cancelleria dovrà provvedere a pubblicare sul Registro delle Imprese entro il giorno successivo**), trasmettendone una **copia** ai **commissari giudiziali**, cui dovrà anche inviare una **breve relazione informativa ed esplicativa, redatta dal suo legale, sullo stato di**

Firmato Da: AGNESE VINCENZA Emesso Da: INFOCERT FIRMA QUALIFICATA 2 Serial#: 6abb52 - Firmato Da: PALUCHOWSKI ALIDA Emesso Da: INFOCERT FIRMA QUALIFICATA 2 Serial#: 5b7e4e





**TRIBUNALE DI MILANO – SEZIONE II CIVILE**

---

**predisposizione della proposta definitiva,** nonché sulla **gestione corrente**, **anche finanziaria**, allegandovi **l'elenco delle più rilevanti operazioni** compiute, sia di **carattere negoziale**, che **gestionale**, **industriale**, **finanziario** o **solutorio**, **di valore comunque superiore ad** Euro **150.000,00,** con l'indicazione della **giacenza di cassa** e delle più rilevanti variazioni di magazzino; **i commissari giudiziali, esaminata tale documentazione, ne riferiranno con motivata e sintetica relazione scritta al Tribunale solo ove ravvisino la violazione ad uno degli obblighi sotto indicati;**
a tal riguardo deve segnalarsi alla ricorrente:

    a) **che non possono essere compiuti fino alla scadenza del termine atti di straordinaria amministrazione, se non previa autorizzazione del Tribunale e solo se ne siano documentati e motivati adeguatamente i caratteri di urgenza ed utilità;**

    b) **che non possono essere effettuati pagamenti di crediti anteriori per nessun motivo;**

    c) **che occorre la specifica e previa autorizzazione del Tribunale anche per sospendere o sciogliere contratti pendenti ex art. 169-*bis*, e per contrarre eventuali finanziamenti, fatti salvi gli ulteriori requisiti previsti dall'art. 182-*quinquies* l.fall.;**

    d) **che non devono comunque compiersi atti da considerarsi vietati ai sensi degli artt. 161, 169-*bis*, 173 e 182-*quinquies* l.fall.;**

    e) **che in caso di violazione di uno qualunque di tali obblighi la domanda verrà dichiarata improcedibile;**

    f) **che il Tribunale disporrà l'immediata abbreviazione del termine nel caso in cui emerga che l'attività compiuta sia manifestamente inidonea alla predisposizione della proposta e/o del piano;**

    g) **che verrà considerato elemento dimostrativo di tale inidoneità – tra l'altro - anche il mancato deposito in termini della cauzione fissata da questo Tribunale;**

**4.** DISPONE che la Cancelleria provveda tempestivamente a restituire al G.rel. il fascicolo del procedimento, unitamente ad eventuali fascicoli prefallimentari, non appena la ricorrente avrà depositato la documentazione su cui verte la riserva di successiva presentazione, ovvero, in caso di omesso deposito, alla scadenza del termine di cui sopra; nonché nei casi in cui il commissario giudiziale riferisca circa la violazione degli obblighi sopra indicati;

5. MANDA alla cancelleria per le comunicazioni e gli altri adempimenti di rito.

Così deciso in Milano, nella camera di consiglio della Seconda Sezione Civile, in data 09/07/2020 .

    Il Giudice estensore                 Il Presidente
    *Dott. Vincenza Agnese*            *Dott. Alida Paluchowski*

Firmato Da: AGNESE VINCENZA Emesso Da: INFOCERT FIRMA QUALIFICATA 2 Serial#: 6abb52 - Firmato Da: PALUCHOWSKI ALIDA Emesso Da: INFOCERT FIRMA QUALIFICATA 2 Serial#: 5b7e4e





# The Court of Milan
## Second Civil Division
## Bankruptcy Division

meeting *in camera* in the persons of

| | |
|---|---|
| Alida Paluchowski | President |
| Guendalina Pascale | Judge |
| Vincenza Agnese | Reporting Judge |

issued the following

### RULING
### PURSUANT TO ARTICLE 161, PARAGRAPH VI, OF THE BANKRUPTCY LAW

HAVING REGARD TO the appeal registered under no. 48/2020 R.G. C.P. with which the company MOBY S.P.A. [tax code 04846130633] filed an application under Article 161, paragraph 6, of the Bankruptcy Law, reserving the right to file a final proposal for an arrangement with creditors within an allocated period (with the plan and documentation referred to in paragraphs 2 and 3 of that provision) or an application for the approval of debt restructuring agreements;

NOTING that the Registry duly requested publication of the application at the Companies Register and forwarded it to the Public Prosecutor's Office in that location, and that the appellant produced the financial statements filed for the years 2016, 2017 and 2018, noting that the financial statements as at 31.12.2019 are in the process of preparation, and also produced an up-to-date Chamber of Commerce registration certificate;

### CONSIDERING

- That such documentation indicates the existence of the subjective requirement of fallibility and the objective requirement of the existence of a state of crisis required to access the procedures for an arrangement with creditors and/or approval of debt restructuring agreements;
- That, pursuant to Articles 3 and 4 of Regulation (EU) 848 of 2015, this Court has jurisdiction and competence as the company COMI is situated in Italy, as the company's registered office is situated in **Milan**, and no evidence exists to establish a possible different location;
- That these are the main proceedings pursuant to Article 3, paragraph 1, of Regulation (EU) 848 of 2015;
- That the existence of the powers of the governing body has also been demonstrated for the purposes of filing the application;
- That the request for granting a period may therefore be accepted, to be fixed specifically, in the light of the content of the application and as emerging from the documentation attached, at 120 days as from the filing of the application (cf. Court of Cassation no. 29740/18);

*Page 1*

EXHIBIT

Onorato B-2

exhibitsticker.com



**COURT OF MILAN – SECOND CIVIL DIVISION**

- That the complexity of the proceedings in the light of the evidence produced and the specific asset and financial position emerging from the accounting documentation produced (cf. financial statements as at 31.12.2018) make it advisable to appoint two judicial commissioners pursuant to Article 161, paragraph 6, as amended by Decree Law No. 69/2013, with the resulting formation of a guarantee for the procedural costs;
- That the specific obligations to provide periodic information referred to in paragraph 8 of the aforesaid provision should be ordered, briefly indicated directly in the operative part;
- That the requirements are not satisfied for joining proceedings no. 49/2020 (application for an arrangement with creditors pursuant to Article 161, paragraph 6, of the Bankruptcy Law, filed by COMPAGNIA ITALIANA DI NAVIGAZIONE S.P.A.) to these proceedings, as our legal system does not provided for the joinder of proceedings for an arrangement with creditors and nor can the provisions of Legislative Decree No. 14/19 on a group arrangement with creditors be applied in advance, irrespective of fulfilment of the relevant requirements, as they are not yet in force;
- That the performance of urgent measures of extraordinary administration cannot henceforth be authorized, even within a certain threshold, as the Court has to call for an assessment in each individual case, after hearing the Commissioners' opinion in advance, while the company may naturally perform measures falling within ordinary administration depending on the size of the company (e.g. purchase of fuel);

## ON THESE GROUNDS

Having regard to Article 161, paragraphs 6 and 8, of the Bankruptcy Law;

1. **GRANTS** the appellant company a **period up to 28/10/2020** to file a final proposal for an arrangement with creditors (with the plan and full documentation referred to in paragraphs 2 and 3 of that provision) or an application for the approval of debt restructuring agreements;

2. **APPOINTS** the following persons as **judicial commissioners**:
**Vincenzo MASCIELLO and Maurizio ORLANDO**
who shall supervise the activities carried out by the appellant company up to expiry of the aforesaid period, immediately reporting to the Court any fact constituting a violation of the obligations referred to in Articles 161 and 173 of the Bankruptcy Law and the other obligations indicated below; and who shall, following the filing of the plan and final proposal, issue their opinion on the possible technical criticisms (excluding aspects of economic feasibility) concerning the plan and proposal;

3. **ORDERS** the appellant:
3.1. within a period of **ten days** as from notification of this ruling, to file **an updated statement of assets**;
3.2. within a period of **fifteen days** as from notification of this ruling, **to deposit the sum of €150,000.00** presumably necessary to pay the fee payable to the judicial commissioners and to cover any other costs of the proceedings, making the relevant payment into a current account to be opened in respect of the proceedings at the bank **Ubi Banca S.p.a.**;
3.3. on the due date of

*Page 2*

Signed by: VINCENZA AGNESE Issued by: INFOCERT FIRMA QUALIFICATA 2 Serial#: 6abb52 – Signed by: ALIDA PALUCHOWSKI Issued by: INFOCERT FIRMA QUALIFICATA 2 Serial#: 5b7e4e



**COURT OF MILAN – SECOND CIVIL DIVISION**

30/07/2020
31/08/2020
30/09/2020

and, **in the event of a request for an extension of the period, simultaneously with the request itself**, to file an **up-to-date financial statement** on the company (**which the Registry shall publish at the Companies Register by the following day**), sending a **copy** to the **judicial commissioners**, who shall also send a **brief informative and explanatory report, drawn up by one of their lawyers, on the state of preparation of the final proposal,** and on the **current management, including the financial management,** attaching a **list of the most significant transactions** performed, whether **contractual** or **managerial, industrial, financial** or **in settlement, for a value exceeding €150,000.00**, indicating the **cash holdings** and the most significant **stock variations; after examining this documentation, the judicial commissioners shall only submit a reasoned and brief written report to the Court if they find that one of the following obligations has been violated;**

In this respect, the appellant must be informed:

    a) that acts of extraordinary administration may not be performed up to expiry of the period, other than with the Court's authorization and only if the urgency and utility thereof are suitably documented and reasoned;

    b) that no prior credit payments may be made <u>for any reason</u>;

    c) that the Court's specific and prior authorization shall be required even to suspend or wind up contracts pending pursuant to Article 169-*bis*, and to contract any loans without prejudice to the further requirements laid down by Article 182- *quinquies* of the Bankruptcy Law;

    d) that no acts must be performed if considered to be prohibited within the meaning of Articles 161, 169-*bis*, 173 and 182-*quinquies* of the Bankruptcy Law;

    e) that, in the event of violation of any one of these obligations, the application shall be declared inadmissible;

    f) that the Court shall immediately shorten the period if the activities carried out are found to be clearly unsuitable for the preparation of the proposal and/or plan;

    g) that failure to deposit the guarantee fixed by this Court in time shall be deemed, *inter alia*, to be evidence of such unsuitability;

**4. ORDERS the Registry to promptly return the case file to the Reporting Judge, together with any pre-bankruptcy files as soon as the appellant has filed the documentation whose subsequent filing is reserved, or, if it is not filed, upon expiry of the aforesaid period; and in cases in which the judicial commissioner reports a violation of the aforesaid obligations;**

5. **SENDS** the file to the registry for communications and other customary measures.

Thus decided in Milan, *in camera*, by the Second Civil Division on 09/07/2020 .

    Reporting Judge           President
    *Vincenza Agnese*        *Alida Paluchowski*

Signed by: VINCENZA AGNESE Issued by: INFOCERT FIRMA QUALIFICATA 2 Serial#: 6abb52 – Signed by: ALIDA PALUCHOWSKI Issued by: INFOCERT FIRMA QUALIFICATA 2 Serial#: 5b7e4e



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK        )
                         )                    ss:
COUNTY of NEW YORK       )

### _CERTIFICATE OF ACCURACY_

This is to certify that the attached document "12831124_1_MOBY_Provvedimento apertura procedura in bianco"-- originally written in _Italian_ -- is, to the best of our knowledge and belief, a true, accurate, and complete translation into _English_.

Dated: 7/9/2021                                     Sworn to and signed before ME
                                                    This 9th day of July, 2021

_Susannah Smith_                                    James G Mamera
Susannah Smith                                      Notary Public
Project Manager
Consortra Translations

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022





# Tribunale di Milano

## Sezione II civile

## Fallimentare

riunita in camera di consiglio nelle persone dei signori

| | |
|---|---|
| Dott. Alida Paluchowski | Presidente |
| Dott. Sergio Rossetti | Giudice |
| Dott. Vincenza Agnese | Giudice relatore |

ha pronunciato il seguente

### DECRETO

Visto il ricorso per concordato preventivo rubricato al n. 48/2020 R.G. C.P. proposto

### DA

**MOBY S.P.A. [C.F. 04846130633], con sede legale in MILANO, VIA LARGA N. 26**

RICORRENTE

### OSSERVA

Con ricorso depositato in data 30.6.2020 MOBY S.P.A. ha proposto domanda per l'ammissione alla procedura di concordato preventivo con riserva e in data 29.3.2021 ha depositato domanda completa, successivamente integrata.

Pende istanza di fallimento (prefall. n. 684/2020) proposta in data 10.8.2020 da alcuni Portatori delle obbligazioni del prestito obbligazionario denominato (€ 300,000,000 7.75% Senior Secured Notes Due 2023) riunita alla presente domanda di concordato.

L'*iter* temporale che ha portato al deposito della proposta e del piano posti all'attenzione del Tribunale può sintetizzarsi come segue:

- in data 30 giugno 2020, la ricorrente ha depositato, una domanda di concordato con riserva ai sensi dell'art. 161, sesto comma, l.fall., chiedendo la concessione del termine massimo previsto dalla legge, pari a centoventi giorni, per il deposito di una domanda volta all'omologazione degli accordi di ristrutturazione ovvero, in alternativa, per il deposito di una proposta di concordato preventivo con continuità aziendale;

- con decreto del 9 luglio 2020 il Tribunale ha concesso i termini di cui all'art. 161, 6 comma, l.f. sino al 28 ottobre 2020 per il deposito del piano e della proposta di concordato preventivo, nonché della documentazione prevista dai commi secondo e terzo del medesimo art. 161 l.fall. o della domanda *ex* art. 182-*bis*, primo comma, l.fall., ponendo a carico della Società gli obblighi informativi di cui all'ottavo comma dell'art. 161 l.fall.;

-in data 23 ottobre 2020 la ricorrente ha depositato istanza di proroga del termine concessole, in accoglimento della quale, il Tribunale ha concesso una proroga del termine *ex* art. 161, sesto comma, l.fall. sino al 28 dicembre 2020;

-la società ha altresì depositato istanza ai sensi dell'art. 9, quarto comma, del D.L. 8 aprile 2020 n. 23, come convertito con legge 5 giugno 2020 n. 40 (il c.d. "Decreto Liquidità"), volta a chiedere la concessione di un ulteriore prolungamento di novanta giorni del suddetto termine;

EXHIBIT

Onorato C-1



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

-il Tribunale, in accoglimento della istanza, concedeva termine fino al 29.3.2021 ritenendo "*di dover eseguire -in aderenza alla ratio della norma applicata in questa sede volta a fornire chances di salvataggio alle imprese in crisi- un necessario contemperamento tra la tutela delle ragioni dei creditori e le conseguenze derivanti dall'arresto della procedura in corso ed apertura di scenari di tipo liquidatorio (essendo Moby s.p.a. attinta da una istanza di fallimento), in punto di possibile interruzione di servizi pubblici e di perdita di numerosi posti di lavoro e con inevitabili negative ricadute anche per lo stesso ceto creditorio nel cui interesse si pone la salvaguardia e la migliore valorizzazione dell'attivo patrimoniale*" (cfr. decreto del 29.12.2020 in atti);

- in data 29 marzo 2021 MOBY ha depositato proposta di concordato preventivo con continuità aziendale, ai sensi dell'art. 186-*bis* l.fall., in uno col piano, la documentazione di legge e la relazione del professionista indipendente dott. Riccardo Ranalli, in possesso dei requisiti di cui all'art. 67, terzo comma, lett. d), l.fall. predisposta ai sensi degli artt. 161, terzo comma e 186-*bis* l.fall. spontaneamente integrata in data 27.4.2021 (nelle more del deposito del parere da parte dei Commissari Giudiziali);

-con provvedimento del 3.5.2021 il Tribunale riscontrava numerose criticità nella proposta e nel piano assegnando termine di giorni quindici dalla comunicazione per il deposito di integrazioni e chiarimenti;

- in data 19.5.2021 la società depositava memoria integrativa volta ad offrire i chiarimenti e le integrazioni richieste nel provvedimento del 3 maggio 2021;

-con successive memorie informative e integrative in atti (l'ultima della quale risalente al 16.6.2021) MOBY S.P.A. provvedeva ad integrare e modificare ulteriormente la proposta e il piano di concordato, anche all'esito di fatti sopravvenuti tra cui l'intervenuta notificazione, da parte di Tirrenia in A.S., di un atto di citazione con cui ha chiesto la condanna di MOBY, ai sensi dell'art. 2900 cod. civ., nonché ai sensi dell'art. 2497 cod. civ. e di cui di seguito si darà conto.

Nel corso della procedura i Commissari Giudiziali (dott.ssa Tiziana Gibillini ed avv. Maurizio Orlando) hanno monitorato l'attività della impresa ed hanno esaminato la proposta, il piano e la documentazione depositando plurimi pareri (l'ultimo in data 22.6.2021).

Dalla documentazione e dagli elementi acquisiti nel corso dell'istruttoria risulta che la domanda risponda alle condizioni richieste dall'art. 160 l. fall., e in particolare:

- la società ricorrente è inquadrabile quale impresa assoggettabile al fallimento, in quanto presenta i requisiti di cui all'art. 1 L.F

- si trova in una situazione di crisi, se non insolvenza, ampiamente argomentata dalla stessa ricorrente.

In particolare MOBY SPA è società soggetta a direzione e coordinamento del socio unico Onorato Armatori S.r.l. ai sensi degli artt. 2497 ss c.c. ed è a sua volta società controllante di COMPAGNIA ITALIANA DI NAVIGAZIONE S.P.A., anche'essa in procedura di concordato preventivo

Il Gruppo Onorato opera attraverso tre principali categorie di business:



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

Traghetti – la flotta è composta da 44 traghetti, attraverso i quali le società del Gruppo Onorato offrono servizi di trasporto passeggeri, veicoli e merci; la società riferisce che si tratta della *business unit* più importante, da cui derivano i principali ricavi del Gruppo Onorato;

Rimorchiatori – le società del Gruppo Onorato gestiscono una flotta di 16 rimorchiatori presso nove porti italiani (otto dei quali in Sardegna), attraverso i quali forniscono servizi di rimorchio sia all'interno dei porti che in mare aperto, ivi incluse le operazioni di sicurezza portuale consistenti nell'assistenza alle navi in manovra e negli interventi di soccorso in caso di incendio e/o incidente;

Operazioni portuali – attraverso le società Sinergest, L.T.M., CPS S.r.l., Tuscany Terminal S.r.l. e Porto di Livorno 2000 S.r.l., che detengono le relative concessioni in esclusiva rilasciate dalle autorità portuali italiane competenti.

Nel complesso la struttura del Gruppo Onorato e del sottogruppo MOBY è rappresentata nel seguente grafico:



La proponente indica quali principali cause della crisi:

a) contrazione dei ricavi: la attivazione delle rotte da e per la Sardegna (segnatamente le tratte Livorno-Cagliari e Livorno-Olbia) da parte dei competitors del gruppo, con la conseguenza che "tale aumento di offerta ha prodotto un inevitabile decremento delle

 **TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

tariffe, dando così avvio a una vera e propria corsa al ribasso dei listini tra i vari operatori in particolare sul settore merci" con conseguente contrazione dei ricavi medi. In particolare la società riferisce che "*la circostanza che – a differenza delle altre compagnie di navigazione – le società del Gruppo Onorato fossero gravate dall'obbligo di mantenere le rotte attive tutto l'anno, ha determinato un aggravio dell'effetto negativo derivante dalla riduzione dei ricavi medi registrati nel corso dell'estate. Per riuscire le quote di mercato complessivamente detenute dalle società del Gruppo Onorato e al fine di rispondere alla competizione avviata sulle rotte da e per la Sardegna, nel corso del 2017 si è reso quindi necessario ampliare le rotte verso la Sicilia nel settore merci. La fase di avvio di alcune rotte siciliane, come la Genova-Livorno- Catania e Malta, iniziata sin dal mese di novembre del 2016, e la Napoli-Catania, intrapresa nel giugno del 2018, ha prodotto gli effetti economici tipici delle start-up*";

b) incremento dei costi, principalmente del bunker e di quelli portuali, che non si sono potuti riversare sugli utenti finali attraverso un aumento delle tariffe a causa della concorrenza determinando così una contrazione del margine di profitto su numerose rotte;

c) iniziativa -definita dalla  ricorrente "speculativa"- consistente nella notifica nel settembre del 2019 di una istanza di fallimento da parte di un gruppo di fondi qualificatisi come creditori di MOBY in quanto portatori, ciascuno per un controvalore superiore ad Euro 100.000,00, di una parte delle obbligazioni del prestito obbligazionario di complessivi Euro 300.000.000,00 denominato "*7.75% Senior Secured Notes due in 2023 (ISIN: XS1361301457 e XS1361300996)*" emesso in data 11 febbraio 2016 ed ammesso alla quotazione presso la Borsa di Lussemburgo: la società riferisce che nonostante il rigetto dell'istanza di fallimento, si è determinato un irrigidimento dell'operatività della società con ricadute negative su alcune operazioni di natura commerciale;

d) effetti della pandemia da Covid-19 che hanno determinato alla data del ricorso ex art. 161, 6 comma, l.f. una considerevole contrazione delle prenotazioni passeggeri.

La società rappresenta di aver proceduto a prendere contatti con  gli istituti di credito e con i *bondholders,* titolari della parte più consistente dell'indebitamento della società, per circa 500.000.000 euro complessivi (assistito da garanzia ipotecaria sulla flotta di C.I.N. per 77 milioni di euro)  per operare la ristrutturazione del debito, ma  che tali contatti non portavano al raggiungimento di  un'intesa con conseguente definitiva determinazione del *management* aziendale a ricorrere allo strumento del concordato preventivo con continuità aziendale per il superamento della propria crisi nei termini che si indicheranno di seguito.

La documentazione di rito prevista dall'art. 161 l. fall. prodotta a corredo dell'istanza fornisce sufficienti elementi positivi per il giudizio a cognizione sommaria richiesto in questa sede, giudizio destinato a subire un riesame approfondito e circostanziato nell'ulteriore corso della procedura, sulla scorta degli accertamenti che si seguito si devolvono ai Commissari Giudiziali.

In particolare:



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

---

a) il ricorso è stato debitamente sottoscritto dal legale rappresentante della società ricorrente;

b) il ricorso contiene una relazione sulla situazione patrimoniale, economica e finanziaria dell'impresa;

c) sono stati prodotti uno stato analitico ed estimativo delle attività e l'elenco dei creditori;

La proposta concordataria e la documentazione sono accompagnate dalla relazione di un professionista in possesso dei requisiti di cui all'art. 67, comma 3, lett. d), l.f. (dott. Riccardo Ranalli) che ha motivatamente dato atto della veridicità dei dati contabili e della fattibilità dello stesso.

La società ricorrente ha basato la propria proposta di concordato su un piano di continuità diretta che ha subito modifiche ed integrazioni dovute anche alle (ineludibili) interferenze con lo strumento di soluzione della crisi infine individuato dalla propria controllata C.I.N. nel concordato in continuità diretta e per effetto della notifica due atti di citazione provenienti da Tirrenia S.p.a. (principale creditore della società C.I.N.).

Appare pertanto opportuno al fine di offrire ai creditori ogni più completa informazione sintetizzare la proposta ed il piano concordatario al fine di comprendere il percorso attraverso il quale MOBY è pervenuta all'attuale conformazione della proposta e del piano.

La formulazione originaria del piano si fondava sulle seguente previsioni:

a) pagamento integrale dei crediti prededucibili;

b) pagamento integrale dei creditori privilegiati assistiti dal privilegio ex art. 552 cod. nav. (entro un anno dall'omologa);

c) pagamento integrale dei creditori assistiti da privilegio generale (entro un anno dall'omologa);

nonché dell'ulteriore ceto creditorio suddiviso nelle seguenti classi (pagg. 12-14 della proposta del 29 marzo 2019):

d) Classe I (creditori privilegiati pignoratizi e ipotecari) →  soddisfatti nei limiti di capienza dei beni su cui insite la causa di prelazione ex art. 160 comma 2 l.f. e ammessi al voto in quanto il soddisfacimento avviene in 36 mesi e pertanto per la moratoria ultrannuale;

e) Classe II (creditori finanziari assistiti da privilegio speciale) →  percentuale di soddisfacimento nella misura del 13-19% per degrado al chirografo nel termine di 48 mesi;

f) Classe III (creditori commerciali chirografari) →  percentuale di soddisfacimento nella misura del 15-21% in 48 mesi;

g) Classe IV (per l'eventuale credito da regresso del Fondo per effetto del pagamento dei creditori iscritti, crediti garantiti da CIN nei limiti di euro 77.000.000) →  percentuale di soddisfacimento nella misura del 30% (in caso di regresso da parte  di un fondo di investimento il cui intervento, all'epoca della redazione del piano originario, avrebbe dovuto costituire la struttura portante dell'accordo di ristrutturazione che C.I.N. auspicava di concludere per effetto dell'accordo con il suo principale creditore Tirrenia S.p.a. in A.S.).

Sulla base della prospettazione originaria del piano l'attivo risultava composto, in principalità, da:



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

- flussi della continuità sulla base del piano industriale relativo al periodo 2021-2025;

- vendita del ramo rimorchiatori;

- vendita di taluni beni considerati non strategici (cinque navi) a fronte dell'ingresso nella flotta durante l'arco di piano di due navi "cinesi",

- vendita degli immobili siti a Milano ed ad Olbia;

- apporto del socio Onorato Armatori S.r.l. (apporto dal quale sarebbe conseguita la liberazione del pegno volontario, rilasciato da Onorato Armatori s.r.l. sul capitale da MOBY S.p.a. ).

Con decreto del 3.5.2021 il Tribunale – anche sulla scorta del parere reso dai Commissari- ravvisava varie criticità nella proposta e nel piano così sinteticamente riassumibili:

a) criticità con riguardo alle individuate classi di creditori sia per effetto della mancata esatta individuazione della misura dei pagamenti ultrannuali dei creditori privilegiati e della conseguente determinazione della perdita economica su cui i creditori privilegiati avrebbero dovuto esprimere il proprio voto sia sulla composizione delle singole classi;

b) criticità in punto di dismissione del ramo rimorchiatori, considerato anche che i flussi derivanti dalla vendita costituiscono parte rilevante del fabbisogno finanziario per l'anno 2022;

c) criticità in punto di determinazione dei flussi della continuità  rilevando come, in estrema sintesi, di fronte a una contrazione considerevole della flotta ed a conseguente riduzione delle rotte, veniva previsto un aumento dei ricavi nell'arco temporale del piano rispetto a quelli conseguiti nell'anno 2019, aumento derivante anche da un aumento delle tariffe e da una contrazione dei costi dei bunker; nel decreto in atti sul punto si evidenziava che le incertezze in ordine alla effettiva consistenza dei ricavi conseguibili sulla base delle assunzioni della società risultavano in parte confermate dallo stesso attestatore nella relazione integrativa che dava atto di aver condotto analisi sul *current trading* con riferimento (i) al fatturato, ai costi e alla ebitda per il periodo gennaio-febbraio 2021 e (ii) ai ricavi passeggeri e merci nel periodo gennaio 2021-19 aprile 2021, ponendo i dati consuntivi "mensilizzati" a confronto con quelli del piano per il medesimo periodo, evidenziando un andamento negativo sia dei ricavi passeggeri che dei ricavi merci rispetto a quanto portato in conto dal piano;

d)  quanto ai flussi della continuità, si chiedeva alla società di chiarire in che modo l'incidenza economica sugli stessi degli esborsi dovuti all'acquisto in arco piano da parte della società F.lli Onorato Armatori S.r.l. di due navi "cinesi" in corso di costruzione, esborsi di fatto ricadenti su MOBY attraverso un articolato meccanismo di contratti di noleggio con pagamenti anticipati, non avrebbe determinato una erosione delle risorse destinate al pagamento dei creditori e si invitava altresì a chiarire gli effetti economici derivanti dalla complessiva operazione prospettata che includeva l'acquisto da parte di MOBY delle quote di F.lli Onorato Armatori S.r.l;

e) criticità in ordine all'apporto da parte di Onorato Armatori S.r.l. di euro 2.000.000 a fronte della "liberazione del pegno volontario rilasciato da Onorato Armatori S.r.l. sul capitale sociale di Moby", ravvisando il Tribunale in detta previsione una illegittima contrazione delle garanzie spettanti ai creditori;



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

f) criticità in punto di previsione da parte della società di elisione delle garanzie dei creditori (anche quelle concesse da terzi) in caso di espressione di voto favorevole, clausola in patente violazione dell'art. 184 l.f.;

g) criticità in punto di determinazione dell'attivo derivante dalla vendita due immobili, in quanto determinato in aumento rispetto alle previsioni di perizia;

h) criticità in punto di determinazione dell'attivo derivante, in uno scenario alternativo, dall'esperimento di azioni di responsabilità nei confronti dell'organo gestorio, del collegio sindacale e della società di revisione per effetto dei fatti censurabili commessi dal *management* aziendale e oggetto di *disclosure* da parte della società nella proposta e nella attestazione.

Con la memoria di chiarimenti del 19 maggio 2021 la società, anche recependo le osservazioni formulate dai Commissari Giudiziali e dal Tribunale, ha modificato la proposta ed il piano, prevedendo un rafforzamento dei flussi di cassa attesi ed in particolare:

• ha chiarito le dinamiche e le assunzioni in base alle quali è stato redatto il Piano industriale 2021 – 2025, con particolare riferimento (i) alle previsioni del traffico passeggeri e merci e dei relativi ricavi, tenuto conto delle stime sulle tariffe e dell'interazione operativa con CIN, (ii) ai noleggi attivi, (iii) alla stima delle componenti i costi operativi e (iv) alla composizione dei flussi derivanti dalla cessione del ramo rimorchiatori;

• ha modificato l'importo e le modalità dell'apporto del socio, (i) incrementando il medesimo da 2 a 6 milioni di euro, (ii) precisando che le relative risorse sarebbero state reperite mediante la cessione di un complesso immobiliare sito in località Porto Cervo di prossima disponibilità e (iii) ha destinato tale apporto a tutti i creditori sociali senza contropartita di rinunzia al pegno sulle azioni MOBY;

• ha inserito la previsione di incasso, nel corso del 2021, dell'importo di 6,7 milioni di euro a valere sul fondo stanziato ai sensi dell'art. 89 del D.L 14 agosto 2020, n. 104, volto a compensare il calo del traffico passeggeri per le imprese marittime a seguito della pandemia da Covid-19;

• ha allineato i valori attesi del realizzo degli immobili - la cui cessione è prevista a Piano - ai (minori) valori espressi dal perito incaricato geom. Luca Mutti, con una previsione di minor incasso di 1,88 milioni di euro;

• ha modificato le tempistiche di soddisfacimento dei creditori privilegiati speciali ipotecari e pignoratizi (classe 1) ed i conseguenti flussi (da 2021 a 2022);

•    ha previsto che i proventi derivanti dalla cessione del ramo rimorchiatori siano accantonati in un escrow account con vincolo di destinazione totale a beneficio dei creditori concordatari e con rilascio immediatamente dopo l'omologa prevista nel 2022.

A seguito del deposito della memoria nei termini sopra indicati la ricorrente subiva l'iniziativa giudiziaria da parte Tirrenia S.p.a. in A.S., creditore di C.I.N. per un importo pari a 180 milioni di euro.

In particolare Tirrenia esperiva azione ex art. 2900 c.c. surrogandosi a CIN nei confronti di MOBY per i crediti vantati dalla prima nei confronti della seconda, contestando la postergazione ex artt. 2467 e 2497-quinquies c.c. e affermando la sussistenza dei requisiti ex art. 2900 c.c. La richiesta fa riferimento all'importo dei crediti che risulta dal bilancio di



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

MOBY al 31 dicembre 2019, indicato in circa 128,6 milioni di euro, con richiesta di ingiunzione ex art. 186-ter c.p.c. per la parte di esso che, secondo la ricostruzione dell'attrice, anche alla stregua delle considerazioni svolte nel parere del prof. Stanghellini (rilasciato su richiesta della stessa MOBY), non sarebbe comunque soggetta a postergazione, pari a 43,8 milioni di euro;   in subordine, Tirrenia in A.S. ha esperito azione di responsabilità nei confronti di  MOBY  e/o di Onorato Armatori S.r.l. ai sensi dell'art. 2497 c.c., chiedendo il risarcimento del danno subito, che fa corrispondere alla quota del proprio credito che non riuscirà a riscuotere e, in via subordinata, alla perdita di chance patita per l'insoddisfazione del credito stesso.

In data 31.5.2021 alla società è stato notificato secondo atto di citazione, notificato da Tirrenia in A.S. a MOBY, CIN e a tutte le banche costituenti il pool dell'operazione del finanziamento rispetto alla quale Tirrenia ha chiesto la declaratoria di inefficacia ex art. 2901 c.c. delle garanzie rilasciate da CIN fino alla concorrenza di 77.000.000 euro (posti a garanzia del rientro dell'esposizione debitoria di MOBY nei confronti degli istituti di credito e dei *bondholders*).

MOBY ha pertanto depositato in data 15.06.2021 una memoria di modifica della proposta e del piano che recepisce:

• gli effetti economici della rinuncia, subordinata all'omologa, da parte di taluni consiglieri di amministrazione agli emolumenti deliberati per l'anno 2021 (0,977 milioni di € al netto delle imposte);

• la previsione, a fronte della passività potenziale emergente dal contenzioso come sopra instaurato da Tirrenia (in particolare dalla causa avente ad oggetto l'azione di risarcimento ex art. 2497 c.c.), dell'accantonamento a fondo dell'importo del rischio massimo, stimato pari a 144 milioni di euro, ed il trattamento di questa passività al pari degli altri creditori chirografari (contestati);

• la riduzione, al fine di assicurare la copertura del relativo fabbisogno senza intaccare la sostenibilità finanziaria del piano, delle percentuali di pagamento previste per i creditori finanziari degradati dal 13% al 9% e, per gli altri creditori chirografari, dal 15% al 12%;

• il rafforzamento della *governance* e dei sistemi di controllo anche in funzione di monitoraggio sull'esecuzione del Piano, sulla base degli impegni assunti da Onorato Armatori S.r.l., socio unico di MOBY, con lettera del 3 giugno 2021.

La proposta al 15.06.2021 prevede quindi:

- di soddisfare integralmente i creditori prededucibili;

- di soddisfare integralmente i creditori privilegiati generali;

- di soddisfare i creditori muniti di privilegio speciale ex art. 552 Cod. Nav. nella misura indicata nella relazione ex art. 160, secondo comma, L.F. con previsione di degrado al chirografo del credito o di parte di esso per il quale il bene oggetto di privilegio speciale risulta incapiente;

- di soddisfare i creditori ipotecari nella misura indicata nella relazione ex art. 160, secondo comma, L.F. con conseguente degrado al chirografo della parte di credito non soddisfatta del privilegio ipotecario e previsione di moratoria ultrannuale per il riconoscimento del loro credito (invariata);



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

- il riconoscimento in favore dei creditori ipotecari dell'extra valore eventualmente derivante dalla cessione degli *assets* in arco piano rispetto al valore individuato nella perizia ex art. 160, secondo comma, L.F.;

- il pagamento parziale dei creditori ipotecari degradati al chirografo nella misura del 9%;

- il pagamento parziale dei creditori chirografari ab origine (nonché un creditore speciale ex art. 552 Cod. Nav.) degradati al chirografo nella misura del 12%;

- il riconoscimento in favore dei creditori chirografari di un ulteriore percentuale pari al 1,1% nel caso di rilascio del fondo vertenze;

- di mantenere in arco piano una cassa minima almeno pari all'eventuale importo necessario per il soddisfacimento dei crediti attualmente appostati a fondo nella misura del 100% per i fondi privilegiati, del 9% per i fondi chirografari degradati, del 12% per gli altri fondi chirografari e del 12% per il fondo contenzioso Tirrenia A.S.

Lo schema complessivo della proposta per effetto di tutte le modifiche ed integrazioni è così delineato graficamente in punto di previsione di pagamenti e in punto di risorse a questi destinati:

| Moby SpA - Rendiconto Finanziario (€000) | Saldo Rettificato 30.06.20 | % Pagamento | Stralcio | Totale Pagamenti | 2021BP | 2022BP | 2023BP | 2024BP | 2025BP |
|---|---|---|---|---|---|---|---|---|---|
| **Cassa BoP** | | | | | 28.703 | 90.505 | 40.201 | 40.840 | 31.749 |
| Flusso di Cassa Operativo | | | | | 15.791 | 37.112 | 23.098 | 17.224 | 22.565 |
| Proventi da Dismissione Navi | | | | | -- | -- | 94.294 | -- | 38.457 |
| Proventi da Dismissione Ramo Rimorchiatori | | | | | 50.000 | -- | -- | -- | -- |
| Proventi da Dismissione Altri Beni | | | | | 6.302 | -- | -- | -- | 4.813 |
| Fondo art. 89 DL 104/2020 | | | | | 6.700 | -- | -- | -- | -- |
| Aumento di Capitale | | | | | -- | 6.000 | -- | -- | -- |
| Pagamenti per Navi Cinesi | | | | | (11.816) | (38.660) | (7.460) | -- | -- |
| **Totale Liquidità a Servizio del Debito** | | | | | 95.680 | 94.957 | 150.134 | 58.064 | 97.584 |
| Prededuzione | - | | - | 11.515 | (5.175) | (4.049) | - | - | (1.000) |
| Privilegio Speciale | 1.303 | 100,0% | | 1.303 | - | (1.303) | - | - | - |
| Debito Banche Privilegiate | 61.625 | 100,0% | | 61.625 | - | (11.834) | (36.832) | (8.868) | (4.092) |
| Debito Bond Privilegiato | 121.241 | 100,0% | | 121.241 | - | (23.281) | (72.462) | (17.447) | (8.050) |
| Privilegio Generale | 14.289 | 100,0% | | 14.289 | - | (14.289) | - | - | - |
| Debito Banche Chirografario | 101.374 | 9,0% | (92.250) | 9.124 | - | - | - | - | (9.124) |
| Debito Bond Chirografario | 199.441 | 9,0% | (181.491) | 17.950 | - | - | - | - | (17.950) |
| Debito Chirografario | 36.743 | 12,0% | (32.334) | 4.409 | - | - | - | - | (4.409) |
| **Totale Passivo / Pagamenti** | 536.016 | | (306.076) | 241.455 | (5.175) | (54.756) | (109.294) | (26.315) | (44.624) |
| **Cassa EoP** | | | | | 90.505 | 40.201 | 40.840 | 31.749 | 52.960 |
| Costituzione Escrow | | | | | (56.302) | | | | |
| **Cassa Disponibile EoP** | | | | | 34.203 | 40.201 | 40.840 | 31.749 | 52.960 |
| Fondo Concordatari Privilegiati | 6.959 | 100,0% | | 6.959 | - | 6.959 | 6.959 | 6.959 | 6.959 |
| Fondo Ipotecari Degradati | 19.384 | 9,0% | (17.640) | 1.745 | - | 1.745 | 1.745 | 1.745 | 1.745 |
| Fondo Chirografari | 38.121 | 12,0% | (33.546) | 4.575 | - | - | - | - | 4.575 |
| Fondo Earn-Out | 30.000 | 12,0% | (26.400) | 3.600 | - | - | - | - | 3.600 |
| Fondo Contenzioso Tirrenia | 144.000 | 12,0% | (126.720) | 17.280 | - | - | - | - | 17.280 |
| Fondo Postergati Riqualificati | 69.630 | 1,0% | (68.934) | 696 | - | - | - | - | 696 |
| **Totale Fondi Concordatari** | 308.095 | - | (273.240) | 34.855 | - | 8.704 | 8.704 | 8.704 | 34.855 |
| **Cassa Residua Post Fondi Concordatari** | | | | | 34.203 | 31.497 | 32.136 | 23.045 | 18.105 |

La versione al 15.06.2021 della proposta non prevede alcuna variazione rispetto alla versione precedente del 19.05.2021 in merito:

- al numero ed alla composizione delle classi, ivi compresa la previsione della classe 4 (figurativa);

- alle tempistiche di pagamento (se non nei limiti sopra evidenziati);

- alle *assumptions* ed alle previsioni del Piano industriale 2021 – 2025.



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

La società ha previsto la formazioni di tre **classi** certe e due classi di incerta configurazione esprimendosi nei seguenti termini nell'ultima proposta modificata:

**Classe 1 (votante)**: composta dai creditori assistiti da privilegio speciale ipotecario e pignoratizio, nei cui confronti è previsto il pagamento nei limiti della capienza dei beni su cui insiste il privilegio, ai sensi dell'art. 160, secondo comma, l.fall., entro il termine di 36 mesi dalla omologazione del concordato, fatta salva la possibilità di eventuali pagamenti anticipati a seguito della cessione dei beni oggetto di garanzia, ammessi al voto in ragione della suddetta moratoria, superiore all'anno di cui all'art. 186- *bis*, secondo comma, lett. c), l.fall..

Nella memoria integrativa la società ha chiarito che la parte del credito privilegiato che subisce la moratoria ultrannuale è quantificabile in circa euro 98.633.000 e che la votazione per effetto per effetto della perdita patrimoniale dovrà avvenire su un importo pari ad euro 15.000.000,00.

**Classe 2 (votante)**: costituita dai creditori finanziari assistiti da privilegio speciale **ipotecario** e pignoratizio sui beni della società, di cui la proposta prevede, ai sensi dell'art. 160, secondo comma, l.fall., la soddisfazione non integrale, per incapienza dei beni su cui insiste il privilegio, per la parte del loro credito degradata al chirografo ai sensi dell'art. 177, terzo comma, l.fall., che verranno soddisfatti nella misura minima garantita pari al 9% delle rispettive pretese e incrementabile fino alla misura massima, non garantita, del 19% delle rispettive pretese, entro il termine di 48 mesi dall'omologazione del concordato e, comunque, non prima che siano stati pagati i creditori assistiti da privilegio generale e speciale, salvi riparti anteriori; nella classe in questione confluiranno i titolari di crediti che trovano appostazione nei fondi chirografari aventi natura finanziaria, che saranno destinatari del medesimo trattamento;

**Classe 3 (votante)**: composta da tutti i restanti creditori commerciali chirografari, in quanto non assistiti da cause legittime di prelazione sin dal momento in cui sono sorti i rispettivi crediti (ivi incluso l'unico creditore commerciale assistito dal privilegio di cui all'art. 552 cod. nav. insistente su un bene di valore incapiente, nonché la componente di credito vantata a titolo di IVA di rivalsa, assistita dal privilegio *ex* art. 2758 cod. civ., ma degradata al chirografo per insussistenza dei beni su cui insistono i relativi privilegi), che verranno soddisfatti nella misura minima garantita pari al 12% delle rispettive pretese e incrementabile fino alla misura massima, non garantita, del 22% delle rispettive pretese, entro il termine di 48 mesi dall'auspicata omologazione del concordato e, comunque, non prima che siano stati pagati i creditori assistiti da privilegio generale e speciale, salvi riparti anteriori; nella classe in questione confluiscono i titolari di pretese che trovano appostazione nei fondi chirografari aventi natura commerciale, che saranno destinatari del medesimo trattamento.

Oltre tali classi la società prevede una **Classe 4**, definita dalla società, "figurativa" in cui verrà a confluire il credito di regresso che CIN (ovvero un soggetto terzo) verrà a vantare nei confronti di MOBY a seguito dell'eventuale pagamento dei creditori ipotecari che hanno iscritto ipoteca sulla flotta navale facente capo alla controllata (*i.e.*, Istituti di credito e *bondholders*), come previsto nella proposta e nel sottostante piano di concordato preventivo



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

che CIN ha depositato in data 24 maggio 2021 che verrà soddisfatto nella misura garantita pari al 30%, in un'unica soluzione entro l'esercizio 2026.

Le pretese avanzate da CIN e MOBY e da altre società del Gruppo Onorato sono state considerate come postergate, ai sensi e per gli effetti degli artt. 2467 e 2497-*quinquies* cod. civ. e, in conseguenza di ciò, per esse non è stato previsto alcun soddisfacimento. La società ne prevede, in via alternativa, il pagamento pari all'1% delle rispettive pretese, entro il termine di 48 mesi dall'omologazione del concordato e, comunque, non prima che siano stati pagati i creditori assistiti da privilegio generale e speciale, salvi riparti anteriori per il caso in cui il Tribunale ritenesse di escludere la postergazione (eventuale **Classe 5**).

In ordine alla previsione delle classi sopra indicate, il Tribunale è chiamato ad esprimere ai sensi dell'art. 163 l.f. il giudizio sui criteri di formazione dovendo la suddivisione dei creditori (qualora prevista) eseguirsi in ragione dell'omogeneità della posizione giuridica e degli interessi economici.

Secondo l'insegnamento della Suprema Corte (Cass. n. 9378/2018 che conferma il proprio precedente Cass. 26 luglio 2012, n. 13284), "*l'omogeneità delle posizioni giuridiche, riguarda la natura oggettiva del credito e concerne le qualità intrinseche delle pretese creditorie, tenendo conto dei loro tratti giuridici caratterizzanti, del carattere chirografario o privilegiato, della eventuale esistenza di contestazioni nella misura o nella qualità del credito, della presenza di un eventuale titolo esecutivo provvisorio.*

*L'omogeneità degli interessi economici, essendo un criterio volto a garantire sul piano sostanziale la par condicio, ha riguardo alla fonte e alla tipologia socio-economica del credito (banche, fornitori, lavoratori dipendenti, ecc.) e al peculiare tornaconto vantato dal suo titolare (in ragione ad esempio dell'entità del credito rispetto all'indebitamento complessivo, della presenza di coobbligati o dell'eventuale interesse a proseguire il rapporto con l'imprenditore in crisi), al fine di garantire secondo canoni di ragionevolezza una maggiore adeguatezza distributiva in presenza di condizioni di omogeneità di posizione.*

*Ne sovviene che i criteri in parola, distinti e concorrenti, debbono essere congiuntamente esaminati per verificare l'omogeneità dei crediti raggruppati, ove l'imprenditore intenda prevedere una suddivisione in classi; tale omogeneità non può però essere predicata in termini di assoluta identità o coincidenza (dato che, ove così fosse, sarebbe possibile formare classi soltanto in presenza di crediti con caratteristiche del tutto uguali), ma consiste invece nella concorrenza di tratti principali comuni di importanza preponderante che rendano di secondario rilievo gli elementi differenzianti e giustifichino secondo criteri di ragionevolezza (o meritevolezza, ex art. 1322 c.c.) una comune sorte satisfattiva delle posizioni riunite all'interno della medesima classe*".

Al di là delle scelte tassonomiche, invero variamente declinate dalla dottrina in materia oltre che dalla giurisprudenza di merito, appare rilevante osservare che del concetto di omogeneità deve essere fornita una lettura in termini di "preponderante affinità" e non di assoluta coincidenza, dal momento che quest'ultima lettura oltre ad essere eccessivamente rigida agevolerebbe una frammentazione eccessiva del ceto creditorio chiamato al voto.

In applicazione dei principi enunciati il Tribunale svolge un giudizio conclusivo positivo in ordine ai criteri di formazione delle prime due classi di creditori formate dai medesimi



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

creditori (banche e bondholders) ammessi al voto nella prima classe in ragione della moratoria loro richiesta e nella classe due per la quota oggetto di degrado in conformità alle previsioni di cui all'art. 177, comma 3, l.f.

Il raggruppamento dei *bondholders* e degli istituti di credito in un'unica classe non presenta evidenti criticità in considerazione della natura complessivamente finanziaria dell'indebitamento, ancorché diversamente declinato, per il prestito obbligazionario, in capitale di credito. L'indebitamento complessivo ammontante a circa 500.000.000 euro (per le cifre esatte, si veda la tabella del passivo *infra*) presenta una unitarietà funzionale trovando la propria genesi nella medesima operazione di  fusione inversa (LBO) tra MOBY S.p.a ed Onorato Armatori S.p.a. risalente all'anno 2016 nell'ambito della quale da un lato, Onorato Armatori S.p.A. (poi fusa in MOBY) ha emesso un prestito obbligazionario, della durata di sette anni, e per un importo pari ad Euro 300 milioni e, dall'altro lato, è stato erogato in favore della stessa Onorato Armatori S.p.A. (oggi MOBY) un finanziamento bancario, di durata quinquennale, dell'importo di complessivi Euro 200 milioni. Risulta peraltro sussistente anche una fonte negoziale comune volta a disciplinare taluni aspetti dei rapporti intercorrenti tra banche e *bondholders* in rapporto alla complessiva erogazione creditoria a favore della società indebitata.

MOBY nella memoria integrativa datata 19.5.2021 ha chiarito –a fronte degli specifici rilievi del Tribunale- che i singoli rapporti (da un lato con gli istituti di credito, dall'altro con i *bondholders*) "*sono stati poi strettamente legati l'un l'altro da un terzo accordo, il c.d. "Intercreditor Agreement", concluso nello stesso giorno in cui è stato formalizzato l'Indenture (11 febbraio 2016), in cui tutte le parti coinvolte (i.e., le società del Gruppo Onorato, gli Istituti di credito e i Bondholders) hanno specificamente disciplinato taluni aspetti, essenziali ai fini del buon esito dell'operazione, tra cui, ad esempio, l'ordine in cui sarebbero stati imputati i pagamenti effettuati dalla società debitrice, le modalità di soddisfacimento dei creditori sulle garanzie concesse dalla debitrice e dalle società del suo gruppo, le modalità per la concessione di ulteriori finanziamenti in favore delle società del Gruppo Onorato, il diritto di opzione, da parte dei Bondholders, per l'acquisto dei crediti vantati dalle Banche, ecc*".

L'intero ammontare del credito è altresì assistito dalle medesime garanzie che si estendono oltre che ai beni e alla flotta di MOBY, anche alla flotta della controllata Compagnia Italiana di Navigazione S.p.a. per un ammontare pari ad euro 77.000.000,00.

Consegue pertanto che l'accorpamento dei *bondholders*  e degli istituti di credito, sulla base degli elementi di valutazione forniti al Tribunale e riservato l'esame di ogni ulteriore elemento allo stato non emerso, deve ritenersi  non patologica dal momento che le due tipologie di creditori presenterebbero tratti comuni – quanto a posizione giuridica ed interessi economici –preponderanti rispetto ai tratti differenzianti.

La collocazione in due classi distinte dei medesimi creditori è consentita in quanto gli stessi votano nella prima classe per il credito privilegiato nascente dalla perdita economica derivante dal pagamento ultrannuale e nella classe seconda votano quali creditori chirografari per effetto dell'intervenuto degrado; e pertanto la suddivisione si giustifica in ragione delle



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

differenti caratteristiche che il medesimo credito viene ad assumere per effetto dell'incapienza dei beni su cui insiste il privilegio.

Quanto ai peculiari meccanismi di formazione del voto da parte degli obbligazionisti, la società ha chiarito che gli stessi saranno chiamati a votare nell'ambito della relativa assemblea ai sensi dell'art. 2415, comma primo, n. 3) c.c. e che l'esito della votazione sarà espresso nel corso dell'adunanza dei creditori dal rappresentante comune dell'assemblea degli obbligazionisti. Non compete al Tribunale stabilire, in questa sede, i criteri e le maggioranze per la valida formazione del voto nell'ambito dell'assemblea, ma giova rimarcare che lo strumento del classamento risulta concepito per agevolare il tentativo del debitore di conseguire il consenso necessario per giungere all'omologazione del concordato, sicché la collocazione degli obbligazionisti (con una fetta di credito superiore rispetto a quella dei creditori finanziari) nella medesima classe degli istituti di credito appare  non confliggente con la clausola generale della buona fede in quanto la società si assume totalmente il rischio del mancato raggiungimento delle maggioranze nelle classi 1 e 2 per effetto di un voto contrario e/o invalido dei *bondholders*.

La classe 3 è formata correttamente da creditori chirografari ab origine (ad eccezione di un privilegio navale incapiente e pertanto degradato).

La società prevede una **Classe 4**, definita dalla società, "figurativa" in cui verrà a confluire il credito di regresso che CIN (ovvero un soggetto terzo) verrà a vantare nei confronti di Moby a seguito dell'eventuale pagamento dei creditori ipotecari che hanno iscritto ipoteca sulla flotta navale facente capo alla controllata (istituti di credito e *bondholders*), come previsto nella proposta e nel sottostante piano di concordato preventivo che CIN ha depositato in data 24.5. 2021 e verrà soddisfatto nella misura garantita pari al 30%, in un'unica soluzione entro l'esercizio 2026.

Alcuna valutazione può esprimere il Tribunale in ordine ad una classe che è attualmente *inesistente* e il cui soddisfacimento è previsto oltre l'orizzonte di piano (come peraltro evidenziato dallo stesso attestatore alla pagina 295 della prima attestazione datata 29.3.2021).

La società, infine, prevede una ulteriore classe del tutto eventuale in cui includere il credito vantato da CIN e da altre società del gruppo nei confronti di MOBY. La ricorrente ritiene l'intera esposizione debitoria di natura postergata per effetto dei rapporti infragruppo e non ne ha previsto alcun pagamento. In via alternativa prevede un pagamento pari all'1% entro il termine di 48 mesi dall'omologazione del concordato per il caso in cui il Tribunale ritenesse di escludere la postergazione (con la conseguente formazione di una ulteriore classe).

A fondamento della tesi della postergazione la società richiama un parere depositato in atti (cd. "parere Stanghellini") con il quale si rappresenta in sintesi che "*1) sia CIN che Moby, società soggette alla medesima attività di direzione e coordinamento, versano attualmente nelle condizioni di squilibrio economico e finanziario previste dall'art. 2467 c.c., e Moby versa in tale condizione almeno dal 2018; 2) in virtù del richiamo contenuto nell'art. 2497 quinquies c.c., l'art. 2467 c.c. è applicabile ai finanziamenti fra società soggette ad attività di direzione e coordinamento da parte della medesima controllante, e dunque anche ai "finanziamenti" da Moby a CIN e viceversa; 3) sono considerati "finanziamenti" ai sensi dell'art. 2467 c.c. anche i crediti commerciali che una delle due società abbia omesso di*



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

*esigere quando l'altra si trovava già nella condizione di squilibrio di cui all'art. 2467 comma 2 c.c.; 4) i crediti postergati non possono essere soddisfatti dalla società che si trova nelle dette condizioni, finché queste durano, e, non essendo esigibili, non sono compensabili né con gli altri crediti postergati, né con i crediti commerciali derivanti dall'operatività corrente e, quindi, non postergati; 5) indipendentemente dalle condizioni economiche e finanziarie delle società del gruppo, si compensano invece in modo automatico, durante il periodo di coesistenza, i crediti commerciali reciproci venuti via via ad esistenza. La differenza fra i reciproci crediti non compensata può divenire postergata in presenza delle condizioni oggettive e cronologiche sopra descritte; 6) il saldo aritmetico dei reciproci crediti-debiti, ammontante a euro 52.314.338 al 31 dicembre 2019 e a euro 50.916.936,05 al 31 marzo 2020, è da considerare interamente postergato".*

Il Tribunale non ignora che il legislatore ha accolto una nozione ampia di finanziamento che prescinde dalle forme utilizzate e che va individuata con riguardo all'interesse concreto sottostante la relativa operazione, ancorché non concretizzantesi nella dazione di una somma di danaro e che di fatto la causa concreta del finanziamento possa annidarsi in rapporti apparentemente di natura commerciale (in ipotesi ad esempio di dilazioni di pagamento che esulano dalla prassi commerciale).

L'art. 2467-quinquies c.c. estende la disciplina dell'art. 2467 c.c. ai finanziamenti effettuati a favore della società da chi esercita attività di direzione e coordinamento nei suoi confronti o da altri soggetti ad essa sottoposti delineando pertanto la specifica fattispecie cui è destinato ad applicarsi, nel caso di finanziamenti infragruppo, il regime della postergazione, fermo restando sul piano oggettivo il presupposto indicato dall'art. 2467 c.c. Il Codice della crisi delimita l'ambito di applicazione della cd. "postergazione infragruppo" prevedendo all'art. 292 comma 1 che "i crediti che la società o l'ente o la persona fisica esercente l'attività di direzione e coordinamento vanta, anche a seguito di escussione di garanzie, nei confronti delle imprese sottoposte, o che queste vantano nei confronti dei primi, sulla base dei rapporti di finanziamento contratti dopo il deposito della domanda che ha dato luogo all'apertura della liquidazione giudiziale o nell'anno anteriore, sono postergati rispetto al pagamento degli altri creditori". La formulazione della norma sancisce, ancorché, allo stato, in via meramente interpretativa, la superfluità dell'esigenza di individuare un vincolo partecipativo diretto che lega le società tra cui intercorre il finanziamento.

Ritenuto di conseguenza che il regime della postergazione possa astrattamente applicarsi anche a società che non siano socie della finanziata (come nel caso di CIN, controllata al 100% da MOBY, il cui socio unico è invece Onorato Armatori), ma ad essa sottoposte, il Tribunale osserva che in questa sede non è tuttavia possibile cristallizzare la posizione creditoria di CIN come postergata o meno.

Infatti se la *ratio* fisiologica della previsione del regime di postergazione è quella di evitare che il rischio di insolvenza dell'impresa venga, di fatto, trasferito sui creditori esterni della società e di neutralizzare una asimmetria informativa tra gli altri inconsapevoli creditori e i soci che, in forza del vantaggio di informazioni derivante dalla partecipazione alla compagine societaria, potrebbero "anticipare" gli altri creditori nella riscossione del proprio credito (da finanziamento), non è da escludere che, in assenza di vantaggi compensativi tra imprese dello



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

stesso gruppo, il regime di postergazione possa tradursi in una ipotesi di abuso della posizione di direzione e coordinamento.

La valutazione deve necessariamente essere rimessa agli approfondimenti demandati all'organo commissariale in quanto tali finanziamenti infragruppo vanno valutati non già isolatamente ma nel complesso della *disclosure* effettuata dalla società nella proposta e nel piano in ordine ai fatti censurabili la cui genesi va individuata nell'operazione di *leveraged buyout* del 2016 di cui si è fatto cenno e di cui si darà conto successivamente, dovendosi valutare se in ragione delle specifiche vicende societarie i finanziamenti in senso ascendente, laddove siano espressione dell'attività di direzione e coordinamento, possano condurre, in presenza di abusi, ad una responsabilità per violazione dei principi di corretta gestione imprenditoriale e societaria a carico della capogruppo, cui si accompagna quella degli amministratori della società controllata finanziatrice, sui quali gravano specifici doveri di monitoraggio in ordine alla situazione finanziaria della capogruppo e in particolare alla sostenibilità e rimborsabilità del prestito ad essa erogato.

La misura della posizione netta come sopra emergente dal parere Stanghellini andrà in ogni caso esaminata nell'ambito del più ampio accertamento della attendibilità dei bilanci delle singole società del gruppo e dei relativi bilanci consolidati di gruppo.

Passando all'esame della situazione patrimoniale complessiva riclassificata ai fini del concordato, si rileva che l'**attivo** è composto, secondo il seguente schema, tratto dalla versione aggiornata dell'attestazione :

| Moby SpA - Rendiconto Finanziario (€'000) | Saldo Rettificato 30.06.20 | % Pagamento | Stralcio | Totale Pagamenti | 2021BP | 2022BP | 2023BP | 2024BP | 2025BP |
|---|---|---|---|---|---|---|---|---|---|
| Cassa BoP | | | | | 28.703 | 90.505 | 40.201 | 40.840 | 31.749 |
| Flusso di Cassa Operativo | | | | | 15.791 | 37.112 | 23.098 | 17.224 | 22.565 |
| Proventi da Dismissione Navi | | | | | -- | -- | 94.294 | -- | 38.457 |
| Proventi da Dismissione Ramo Rimorchiatori | | | | | 50.000 | -- | -- | -- | -- |
| Proventi da Dismissione Altri Beni | | | | | 6.302 | -- | -- | -- | 4.813 |
| Fondo art. 89 DL 104/2020 | | | | | 6.700 | -- | -- | -- | -- |
| Aumento di Capitale | | | | | - | 6.000 | -- | -- | -- |
| Pagamenti per Navi Ghesi | | | | | (11.816) | (38.660) | (7.460) | -- | -- |
| **Totale Liquidità a Servizio del Debito** | | | | | **95.680** | **94.957** | **150.134** | **58.064** | **97.584** |

Il piano prevede la dismissione del **ramo rimorchiatori** in ordine al quale l'attestatore rileva che "*la rilevanza del flusso in questione ai fini della copertura del fabbisogno finanziario previsto per il 2022 fa sì che il mancato perfezionamento della dismissione del ramo rimorchiatori nei termini previsti dal piano integri un autonomo punto di rottura dello stesso che dovrà essere oggetto di monitoraggio*" (pag. 29 attestazione del 15.6.2021).

Come correttamente osservato dall'attestatore il fabbisogno concordatario relativo all'anno 2022 si fonda sulle risorse derivanti dalla dismissione del ramo rimorchiatori; pertanto ai fini di consentire ai creditori di esprimere un consenso realmente informato e verificare immediatamente la concreta tenuta del piano, il processo di dismissione del ramo dovrà giungere necessariamente a finalizzazione prima del deposito della relazione ex art. 172 l.f. (quantomeno attraverso l'aggiudicazione) e la vendita dovrà perfezionarsi entro la fine del corrente anno e prima dell'adunanza dei creditori.



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

Ciò in conformità alla previsione di cui all'art. 182 l.f. che laddove contempla l'applicabilità degli articoli da 105 a 108 ter l.f., sia pure in quanto compatibili, alle vendite, alle cessioni ed ai trasferimenti legalmente posti in essere dopo il deposito della domanda di concordato ammette pacificamente che la vendita dei beni sia anticipata ad un momento anteriore rispetto all'omologazione, o anche alla approvazione della proposta concordataria.

A tale riguardo, facendo richiamo ai principi di competitività immanenti nel sistema della legge fallimentare, la società dovrà –sotto la vigilanza dell'organo commissariale- avviare immediatamente la procedura volta alla dismissione dell'*asset* costituito dal ramo rimorchiatori, attraverso una capillare pubblicità che investa il peculiare settore di riferimento nonché –come indicato dall'attestatore- attraverso la ripresa dell'attività di *due diligence* nei confronti dei soggetti che avevano già espresso un interessamento.

Ai fini di offrire ai creditori ogni opportuna informazione va osservato che la società ha previsto nel piano -come modificato- che le somme derivanti dalla dismissione di detto ramo vadano a confluire in un conto vincolato fino alla eventuale omologa del concordato.

E difatti nella versione originaria del piano la società *condizionava* l'operazione di alienazione del ramo rimorchiatori alla immediata cancellazione delle ipoteche su di esse gravanti.

Nel decreto del 3.5.2021, il Tribunale osservava che, se da un parte, la lettura combinata delle norme di riferimento viene a consentire di procedere alla cancellazione delle ipoteche anche prima della omologa del concordato (e finanche prima dell'espressione del voto da parte dei creditori), in questi casi, in applicazione analogica dell'art 111-*ter* l.f., appare opportuno che le somme ricavate dalla liquidazione dei beni vadano a confluire in un conto vincolato all'ordine del Tribunale, e non si confondano con il patrimonio della società in concordato fino al momento della eventuale omologa, a maggior ragione nei casi in cui, essendo prevista la continuità, si palesi in modo ancora più evidente il rischio che le somme costituenti il realizzo dei beni gravati da prelazione si confondano con la massa liquida generale, venendo distolte dalla originaria e vincolata finalità di soddisfazione dei privilegiati.

Con riguardo all'attivo costituito **dai flussi di cassa della continuità**, il Tribunale nel decreto del 3.5.2021 sollevava numerosi rilievi – fondati sulle criticità emerse dall'analisi effettuata dai precommissari- in ordine alla tenuta del piano rilevando come in estremi sintesi di fronte a una contrazione considerevole della flotta ed a conseguente riduzione delle rotte, veniva previsto un aumento dei ricavi nell'arco temporale del piano rispetto a quelli conseguiti nell'anno 2019, aumento derivante anche da un aumento delle tariffe e da una contrazione dei costi dei bunker.

Le incertezze in ordine alla effettiva consistenza dei ricavi conseguibili sulla base delle assunzioni della società  venivano in parte confermate dallo stesso attestatore nella prima relazione integrativa ove lo stesso dava atto di aver condotto analisi sul *current trading* con riferimento (i) al fatturato, ai costi e alla ebitda per il periodo gennaio-febbraio 2021 e (ii) ai ricavi passeggeri e merci nel periodo gennaio 2021-19 aprile 2021, ponendo i dati consuntivi "mensilizzati" a confronto con quelli del piano per il medesimo periodo, evidenziando un



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

---

andamento negativo sia dei ricavi passeggeri che dei ricavi merci rispetto a quanto portato in conto dal piano.

Nell'integrazione del 15.6.2021 l'attestatore ha svolto nuovamente un'approfondita analisi del *current trading*, evidenziando gli scostamenti rispetto alle previsioni di piano del fatturato passeggeri e merci consuntivo maggio 2021 posto a confronto con il medesimo periodo di piano, come emerge dalla tabella che segue:

**Ricavi PAX - Moby**

| K€ | mag 2021 (ytd) |
|---|---|
| Ricavi actual | 5.854 |
| Ricavi Piano (versione 11 giugno) | 11.095 |
| Delta | -5.240 |
| % scostamento da Piano | -47% |

**Ricavi MERCI – Moby**

| K€ | mag 2021 (ytd) |
|---|---|
| Ricavi actual | 11.843 |
| Ricavi Piano (versione 11 giugno) | 13.039 |
| Delta | -1.196 |
| % scostamento da Piano | -9% |

Dalla tabella sopra riportata emerge un significativo scostamento rispetto alla previsioni del piano con riferimento ai ricavi passeggeri; tuttavia l'attestatore evidenzia come tale scostamento appaia in contrazione rispetto a quello di cui al mese di aprile. Quanto ai ricavi merci il dato di maggio fa emergere un ritardo rispetto a quanto previsto dal piano di complessivi 1,2 milioni di euro (-9%).

L'attestatore ha altresì esaminato – quanto ai ricavi passeggeri- le prenotazioni al 13.6.2021, dalle quali emerge un netto miglioramento delle prenotazioni rispetto al 2020 ma in contrazione rispetto al 2019, rappresentando che *"Con riferimento invece al viaggiato "dopo il 13 giugno", (le effettive previsioni di viaggio indipendentemente dalle prenotazioni ndr) il management di Moby ha previsto una overperfomance rispetto sia al 2019 (+36%) che al 2020 (+30%).*

Il dettaglio dell'analisi è indicato nella seguente tabella quanto ai "ricavi passeggeri"



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

| Passeggeri (KC) | gen-19 | feb-19 | mar-19 | apr-19 | mag-19 | giu-19 | lug-19 | ago-19 | set-19 | ott-19 | nov-19 | dic-19 | FY 2019 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| viaggiato al 13/6 | 1.392 | 960 | 1.508 | 4.490 | 4.816 | - | - | - | - | - | - | - | 13.165 | | |
| prenotato al 13/6 | - | - | - | - | - | 13.350 | 12.968 | 13.710 | 4.159 | 696 | 8 | 3 | 48.894 | | |
| viaggiato dopo il 13/6 | - | - | - | - | - | 2.343 | 8.668 | 20.294 | 10.281 | 3.993 | 1.163 | 1.551 | 48.295 | | |
| altro (cancellaz., cambi, ecc.) | 10 | (31) | (14) | 35 | 52 | 319 | 432 | 818 | 351 | 58 | 1 | 14 | 2.045 | | |
| **totale** | **1.402** | **929** | **1.494** | **4.525** | **4.868** | **16.012** | **22.068** | **38.822** | **14.792** | **4.747** | **1.172** | **1.569** | **112.399** | | |
| passeggeri (#) | 56.439 | 43.487 | 67.449 | 152.635 | 179.542 | 380.827 | 510.536 | 660.348 | 358.206 | 157.473 | 52.274 | 58.596 | 2.671.365 | | |
| tariffa media (€/#) | 24,8 | 21,4 | 22,2 | 29,6 | 27,9 | 42,0 | 43,2 | 58,6 | 41,3 | 30,2 | 22,4 | 28,1 | 42,1 | | |

| | gen-20 | feb-20 | mar-20 | apr-20 | mag-20 | giu-20 | lug-20 | ago-20 | set-20 | ott-20 | nov-20 | dic-20 | FY 2020 | % 19-20 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| viaggiato al 13/6 | 1.440 | 974 | 357 | 24 | 287 | - | - | - | - | - | - | - | 3.082 | -77% | |
| prenotato al 13/6 | - | - | - | - | - | 3.178 | 5.240 | 7.276 | 2.460 | 563 | 6 | 2 | 18.725 | -62% | |
| viaggiato dopo il 13/6 | - | - | - | - | - | 1.751 | 9.710 | 27.228 | 8.083 | 2.606 | 561 | 660 | 50.607 | 5% | |
| altro (cancellaz., cambi, ecc.) | (2) | 21 | 75 | 10 | (36) | (47) | 119 | 389 | 148 | 18 | (14) | (6) | 675 | -67% | |
| **totale** | **1.438** | **995** | **432** | **34** | **251** | **4.881** | **15.070** | **34.893** | **10.691** | **3.187** | **553** | **664** | **1.439.187** | **-35%** | |
| passeggeri (#) | 50.397 | 39.054 | 11.612 | 9 | 6.317 | 103.356 | 315.877 | 556.515 | 236.392 | 85.448 | 16.769 | 17.441 | 1.439.187 | | |
| tariffa media (€/#) | 28,5 | 25,5 | 37,2 | 3.803,4 | 39,7 | 47,2 | 47,7 | 62,7 | 45,2 | 37,3 | 32,9 | 38,1 | 50,8 | | |

| | gen-21 | feb-21 | mar-21 | apr-21 | mag-21 | giu-21 | lug-21 | ago-21 | set-21 | ott-21 | nov-21 | dic-21 | FY 2021 | % 19-21 | % 20-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| viaggiato al 13/6 | 624 | 723 | 762 | 914 | 2.901 | - | - | - | - | - | - | - | 5.923 | -59% | 92% |
| prenotato al 13/6 | - | - | - | - | - | 7.094 | 10.635 | 13.039 | 2.838 | 344 | 2 | 0 | 33.952 | -31% | 81% |
| viaggiato dopo il 13/6 (piano) | - | - | - | - | - | 9.644 | 13.217 | 26.528 | 11.482 | 2.358 | 951 | 1.461 | 65.641 | 36% | 30% |
| altro (cancellaz., cambi, ecc.) | (3) | (11) | (17) | (38) | - | - | - | - | - | - | - | - | (69) | -103% | -110% |
| **totale** | **621** | **711** | **744** | **876** | **2.901** | **16.738** | **23.852** | **39.567** | **16.320** | **2.702** | **954** | **1.462** | **105.448** | **-6%** | **44%** |
| passeggeri (#) | 15.471 | 18.655 | 19.807 | 25.256 | 70.117 | 352.844 | 484.330 | 613.069 | 294.955 | 116.287 | 49.678 | 59.916 | 2.120.386 | | |
| tariffa media (€/#) | 40,2 | 38,1 | 37,6 | 34,7 | 41,4 | 47,4 | 49,2 | 64,5 | 48,5 | 23,2 | 19,2 | 24,4 | 49,7 | | |

I Commissari Giudiziali, nel parere depositato in atti, danno evidenza della fragilità dei margini di resistenza a variazioni negative, mettendo in evidenza che il fatturato dei viaggi passeggeri tra giugno e dicembre 2021 "*è stimato in complessivi 65.641 K €, di fronte a un dato pari a complessivi 50.607 K € nel 2020 e a 48.295 K € nel 2019*".

L'attestatore riferisce il seguente scenario di *sensitivity*, prevedendo una riduzione dei ricavi per un ammontare pari a 15 milioni di euro, giungendo alla conclusione che tale contrazione sarebbe sostenibile fino al 2024:

"*il Piano evidenzia, per i primi due anni, una significativa robustezza. In particolare, la soglia di rottura per l'anno di Piano 2022 si colloca su tariffe medie inferiori ai dati consuntivati nel 2019 (e quindi significativamente inferiori, di circa il 13%, rispetto ai dati del 2020);*

*gli anni di Piano ricompresi tra il 2023 ed il 2025, invece, evidenziano una maggior fragilità, principalmente in considerazione delle minori disponibilità liquide, che tengono conto delle rettifiche ai flussi effettuate dallo scrivente, legate al servizio del debito concorsuale. Negli anni in oggetto, la soglia di rottura del piano si colloca su tariffe medie via via crescenti ed inferiori tra l'8% ed il 2% rispetto al Piano;*

*nel caso in cui le tariffe medie si ricollocassero sui livelli del 2019 (dato medio pari a circa 42 € ovvero inferiori di circa l'11% rispetto al dato di Piano e di circa il 17% rispetto al dato del 2020), il Piano non presenterebbe sostenibilità finanziaria a partire dal 2023*".

La tabella dell'attivo individua i flussi destinati al pagamento delle "**navi cinesi**" i cui pagamenti si iscrivono nell'ambito di una più complessa operazione negoziale finalizzata all'acquisto da parte di MOBY delle quote della società F.lli Onorato Armatori S.r.l., società che ne ha commissionato la costruzione.

Secondo la prospettazione della società l'operazione delle cd. "navi cinesi" "*nasce dall'esigenza di rafforzare e consolidare la posizione del Gruppo Onorato (e, segnatamente, della Società) sul mercato e, allo stesso tempo, di anticipare e rispettare tutti i vincoli normativi in ambito ambientale richiesti dalla normativa nazionale e internazionale. L'entrata nella flotta delle cd. navi cinesi consente difatti di efficientare la flotta e dismettere le navi ritenute più desuete, che richiedono costi di mantenimento più elevati. In particolare, nel Piano si prevede che nel corso del 2023, in concomitanza con la consegna delle navi cinesi, vengano cedute le motonavi "Moby*



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

---

*Aki", "Moby Wonder", "Giuseppe Savarese" e "Pietro Manunta", per un valore di oltre Euro 94.000 mila. Dal punto di vista economico, la Società ha stimato che, sfruttando la maggiore capacità di carico messa a disposizione dalle navi cinesi, la maggiore efficienza dei consumi e, allo stesso tempo, il risparmio dei costi relativi alle navi messe in vendita in arco di Piano, si possa conseguire un maggior EBITDA, per circa **Euro 3.000 mila**".*

Nella prospettazione della società la società mira a controbilanciare la consistente contrazione della flotta per effetto delle programmate dismissioni e a sostituire pertanto le navi vendute con navi che la società assume caratterizzate da una maggiore capacità di carico e pertanto più efficienti rispetto alle navi di cui si programma la vendita.

Tuttavia la società non ha offerto una adeguata rappresentazione dei rischi derivanti da un ritardo nella consegna delle navi o dall'ipotesi più grave della mancata consegna delle navi per effetto della risoluzione dei relativi negozi sottostanti (rischio che –pur considerato remoto dalla società- l'attestatore evidenzia alla pag. 57 dell'attestazione originaria) e dei conseguenti effetti economici sui flussi della continuità (e sulla conseguente tenuta del piano), dovendosi sul punto rimettere all'organo commissariale ogni necessario accertamento dell'impatto economico degli elementi di criticità indicati sulla tenuta del piano.

Sul punto, il Tribunale richiama i doveri di vigilanza e monitoraggio rimessi all'organo commissariale e in aderenza alla prospettazione dell'attestatore, rileva la fondamentale necessità per la società in concordato di munirsi di un CRO (*Chief Restructuring Officer*) indipendente al fine di attivare le misure di *recovery* nel caso di scostamenti delle previsioni sottostanti il piano di concordato, come di seguito si darà più diffusamente conto.

I dati sopra riportati risentono, per l'evidenza che ne fornisce lo stesso attestatore, della necessità di eseguire in ogni caso un aggiornamento del piano al fine di allineare i piani individuali di MOBY e CIN, anche a seguito del deposito della domanda di concordato preventivo da parte di quest'ultima.

L'attestatore sul punto evidenzia che "*il piano industriale a monte dei piani di ristrutturazione di MOBY e CIN era stato inizialmente concepito sulla base di un unico "operativo navi", relativo alla flotta di entrambe le Società e ciò in coerenza con le modalità con le quali il Gruppo programmava l'impiego delle navi. A maggio 2021 il management ha aggiornato l'operativo navi, recependone gli effetti solo sul Piano di CIN, che era in corso di finalizzazione in vista del deposito del Piano e della Proposta di concordato per il quale lo scrivente ha reso la propria attestazione lo scorso 11 giugno. Analogo aggiornamento non è, invece, stato fatto per Moby. Per tale motivo, allo stato attuale, i due piani individuali di Moby e CIN non sono allineati a livello di operativo navi e di macro assunzioni, con particolare riferimento all'impatto Covid sul 2021 ed all'andamento della curva del bunker, che lo scrivente ha trattato nell'ambito dell'analisi dei relativi punti di rottura. Gli ulteriori elementi correlati all'aggiornamento dell'operativo navi non paiono, invece, poter avere un impatto negativo sui flussi dell'attuale piano di Moby*".

Nella tabella dell'attivo sopra riportata è inserito **l'apporto di euro 6.000.000,00 da parte del sig. Vincenzo Onorato** personalmente e nella sua qualità di socio unico e legale rappresentante della Onorato Armatori S.r.l., il quale con dichiarazione trasmessa alla ricorrente in data 19.5.2021 (sub doc. 182) ha esposto che «*ai fini di rafforzare la*



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

---

*generazione dei flussi di cassa e nella piena consapevolezza dei sacrifici richiesti ai creditori sociali d Moby […], ai fini del e subordinatamente al buon esito del Concordato Preventivo […], assume, ora per allora, l'impegno irrevocabile alla corresponsione – entro 6 mesi dall'emissione, dal parte del Tribunale di Milano, del decreto di omologazione definitiva del Concordato Preventivo – di un contributo personale in favore di Moby e dei suoi creditori, nel rispetto dei legittimi diritti di prelazione degli stessi, di importo pari a complessivi € 6.000.000,00»*, con la precisazione che l'efficacia di tale impegno di apporto *«è sospensivamente condizionata all'emissione, da parte del Tribunale di Milano, del decreto di omologazione definitiva del Concordato Preventivo»* ("l'Apporto Onorato").

Il piano e la memoria precisano che:

- l'apporto non è più destinato ai creditori di classe 1 e 2 quale contropartita della loro eventuale rinunzia al pegno sulle azioni MOBY, ma è destinato a tutti i creditori della società;

- al fine di reperire le risorse per eseguire tale apporto, *«l'azionista o altri membri della famiglia provvederanno al conferimento di un mandato irrevocabile all'ammissione del concordato ad un primario operatore di mercato per la vendita di una parte rilevante del patrimonio immobiliare nelle disponibilità dell'azionista, che si impegnerà irrevocabilmente a versare ogni provento, netto spese, derivante dalla vendita di tali asset immobiliari in Onorato Armatori Srl e quindi in Moby, fino a concorrenza dell'importo di €6m».*

Occorre dare atto che l'attestatore non tiene conto di tale apporto ai fini del giudizio di fattibilità  in quanto l'impegno è subordinato alla definitività del decreto di omologa ed esposto al rischio di revocatoria da parte dei creditori personali del socio.

Osserva il Tribunale sul punto che la manifestazione di volontà da parte del socio andrà modificata al fine di rendere la stessa seria e concreta nei contenuti, nei tempi e nelle modalità.

L'attivo indicato in tabella fattorizza   l'importo di euro 6,7 milioni per effetto **dell'accesso al fondo stanziato ai sensi dell'art. 89 d.l. n. 104/2020**, volto a compensare il calo del traffico passeggeri per le imprese marittime a seguito della pandemia da Covid-19.

Al riguardo vanno rimesse all'organo commissariale le verifiche circa la correttezza della stima effettuata e le prospettive di concreta erogazione del contributo.

Il passivo nell'attestazione  è sinteticamente individuato come segue:

*Euro '000*

| Indebitamento | Indebitamento rilevante | Prededuzioni | Debiti privilegiati | Debiti chirografari | Debiti postergati |
|---|---|---|---|---|---|
| Patrimonio Netto | - | | - | - | - |
| Fondi per rischi ed oneri | 175.609 | 11.515 | 26.343 | 137.751 | - |
| Trattamento di fine rapporto | 108 | - | 108 | - | - |
| Obbligazioni | 320.682 | - | 320.682 | - | - |
| Debiti verso banche | 165.723 | - | 162.999 | 2.724 | - |
| Acconti | 16 | - | 1 | 15 | - |
| Debiti verso fornitori | 41.273 | - | 7.677 | 33.596 | - |
| Debiti intercompany | 69.666 | - | - | 35 | 69.630 |
| Debiti tributari | 4.388 | - | 4.388 | - | - |
| Debiti previdenziali | 2.822 | - | 2.822 | - | - |
| Altri debiti | 970 | - | 943 | 28 | - |
| Ratei e risconti passivi | - | - | - | - | - |
| **Totale** | **781.256** | **11.515** | **525.962** | **174.149** | **69.630** |



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

Sono stati appostati adeguati fondi rischi anche per effetto degli interventi dell'attestatore.

La tabella contenente il passivo individua i debiti infragruppo come postergati. Sul punto i commissari dovranno eseguire le verifiche sopra indicate.

Si rimette all'organo commissariale la valutazione dell'adeguatezza del fondo rischi appostato per euro 4.000.000 al chirografo per la sanzione -da (ri)determinarsi per effetto della recente decisione del Consiglio di Stato- da parte dell'AGCOM per l'abuso di posizione dominante accertata in violazione dell'art. 102 del Trattato sul funzionamento dell'Unione Europea.

Ai sensi della Legge 132 del 2015 la proposta deve indicare l'utilità specificamente individuata ed economicamente valutabile  che il proponente si obbliga ad assicurare  a ciascun creditore.

Nel caso specifico essa è indicata in un pagamento pecuniario la cui percentuale garantita nell'attestazione è individuata in quella minima indicata dalla società in relazione alla quale il professionista designato ha espresso il proprio giudizio in ordine al miglior soddisfacimento dei creditori. La relazione del professionista idoneo ad essere nominato curatore ai sensi dell'art. 28 della legge 2006 n. 5 attesta la veridicità dei dati posti a base della proposta, avendo eseguito controlli che sembrano avere rivestito lo standard richiesto dalle *best practices*, ed avendo rinnovato i suddetti controlli all'esito della elaborazione della nuova versione della proposta.

La relazione è risultata redatta in modo apparentemente corretto, soprattutto per quanto riguarda il controllo di veridicità della contabilità e dei dati posti a base della situazione patrimoniale (peraltro assoggettata a continua verifica e aggiornamento) che non ha presentato irregolarità tali da inficiare l'attendibilità del piano proposto.

La relazione appare allo stato analitica, esaustiva e coerente alla luce dell'*iter* logico-argomentativo posto alla base dell'attestazione di fattibilità del piano e della metodologia seguita nei controlli effettuati ai fini dell'attestazione di veridicità dei dati contabili esposti dalla società.

In particolare, trattandosi di concordato in continuità gli argomenti svolti a sostegno della funzionalità della prosecuzione dell'attività posta alla base del piano di concordato in continuità rispetto al **miglior interesse dei creditori** appaiono adeguatamente illustrati dall'attestatore, il quale evidenzia che il concreto scenario di comparazione è costituito da una **procedura di amministrazione straordinaria**.

Come è noto l'interesse tutelato in via prioritaria dalla amministrazione straordinaria va individuato nella conservazione del patrimonio produttivo, cioè dei complessi aziendali in funzionamento e non già dal patrimonio del debitore in sé considerato.

La tutela dei complessi produttivi in quanto tali unitamente al mantenimento dei livelli occupazionali -costituenti il fulcro della disciplina della amministrazione straordinaria-realizzano quello che è stato definito un "rovesciamento copernicano" della scala di valori che risultano invece protetti nel concordato preventivo.



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

Si consideri, ad esempio, la previsione di cui all'art. 63 della l. n. 270/199 secondo cui nella vendita di "aziende in esercizio" il prezzo della vendita deve tenere conto della redditività, anche se negativa, non soltanto all'epoca della stima, ma anche nel biennio successivo.

L'art. 55 del l.dgs. n. 270/1999 sottolinea, poi, l'esigenza di salvaguardia dei complessi aziendali nella loro unità operativa mentre quanto all'interesse dei creditori la norma stabilisce che di esso va semplicemente "tenuto conto" sancendone la sua ineludibile recessività rispetto ai preminenti interessi tenuti in considerazione dal dato normativo.

Diversamente nell'art. 186 bis l.f. sia la prosecuzione dell'attività di impresa da parte del debitore sia la cessione dell'azienda in funzionamento a terzi devono risultare funzionali *al miglior soddisfacimento dei creditori,* il cui esito dipende dal voto dei creditori che sono chiamati a valutare la convenienza di un piano che deve necessariamente contemplare –pena il venir meno della causa concreta del concordato- il soddisfacimento non irrisorio e in tempi ragionevoli anche dei creditori chirografari; mentre è frequente nelle amministrazioni straordinarie assistere alla decurtazione finanche dei crediti prededucibili con conseguente graduazione dei medesimi.

L'art. 186-bis comma 2, lett. b) l.f. impone, inoltre, che la relazione del professionista debba contenere, oltre alla attestazione della veridicità dei dati aziendali e alla fattibilità del piano proposto, la funzionalità dello stesso, appunto, *al miglior soddisfacimento dei creditori*. Allo stesso modo, l'autorizzazione a contrarre finanziamenti prededucibili, richiede l'attestazione del professionista che tali finanziamenti siano funzionali al *miglior soddisfacimento dei creditori* (e lo stesso vale per il pagamento dei creditori anteriori ex art. 182-quinquies, comma 5 l.f.).

Del miglior soddisfacimento dei crediti parla ancora l'art. 3 lett. f) della legge delega n. 155/2017, proprio a proposito della insolvenza dei gruppi di imprese, prevedendo che, nella gestione unitaria della procedura di concordato preventivo, devono essere stabiliti i criteri per la formulazione del piano unitario di risoluzione della crisi del gruppo, attraverso operazioni negoziali intragruppo, ancora una volta funzionali non solo alla continuità aziendale ma anche al *miglior soddisfacimento degli interessi dei creditori.*

Pertanto, lo strumento concordatario anche nel caso in esame e nonostante le criticità sopra segnalate, appare al Tribunale –allo stato e salve le diverse valutazioni comparative rimesse all'organo commissariale- la migliore soluzione prospettabile in concreto (rispetto allo scenario dell'amministrazione straordinaria) al fine di offrire la più estesa tutela al ceto creditorio globalmente inteso e non solo a limitate categorie di essi.

Va in ogni caso rimesso al concreto vaglio dell'organo commissariale la valutazione di scenari alternativi che tengano conto (anche) della concreta esperibilità di azioni di responsabilità nei confronti dell'organo gestorio, del collegio sindacale e della società di revisione.

Il Tribunale osserva che la società ha realizzato una ampia *disclosure* sui fatti censurabili compiuti dai soggetti appena menzionati attraverso una valutazione ad ampio spettro da parte dell'attestatore fondata su una specifica   verifica *forensic* eseguita dalla dott. Stefania Chiaruttini, finalizzata alla individuazione di fatti ed operazioni intervenute in capo a MOBY



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

e CIN suscettibili di aver cagionato un danno ai creditori sociali e in ogni caso fonte di responsabilità.

In particolare nell'attestazione, il dott. Riccardo Ranalli fornisce una sintesi delle evidenze emerse in punto di:

1) *governance* ed assetti interni, rilevando l'inadeguatezza del sistema di gestione e di controllo, non sufficientemente strutturate per garantire il corretto presidio di talune attività sensili, quali i rapporti tra le parti correlate;

2) operazione di rifinanziamento e LBO, con specifico riguardo all'operazione di fusione inversa risalente all'anno 2016 tra Onorato Armatori S.p.a. e Moby, operazione che pur riguardando due sole società del gruppo, veniva fondata su un piano industriale sottostante in cui la sostenibilità del debito aveva riguardo ai flussi generati dall'intero gruppo (pertanto anche da CIN), e non già dalle sole società coinvolte nell'operazione;

3) operatività con CIN, strettamente connessa ai profili di cui al punto 2), con specifico riguardo al servizio di bigliettazione svolto per conto di CIN da MOBY, la quale ultima dopo aver incassato direttamente gli introiti derivanti dalla vendita di biglietti, non ha riservato gli stessi nelle casse della controllata; il profilo è agganciato alla operazione di fusione inversa del 2016, alla quale CIN rimaneva estranea ma la sostenibilità del debito veniva dimostrata e verificata con riguardo ai flussi generati dal gruppo, determinando una situazione di disallineamento, che ha comportato la necessità di far confluire gli incassi di CIN in MOBY con conseguente sistematico drenaggio di risorse della controllata;

4) rapporti tra la società e l'organo di gestione, con riguardo a: a) all'entità dei compensi corrisposti nel periodo 2015-2019 a membri del CdA, di importo superiore alla media di quelli erogati da società nazionali ed estere comparabili; b) ai rapporti economici intercorsi tra la società e alcuni componenti del cda in ordine alla vendita di immobili da parte di questi ultimi a MOBY; c) a rapporti di consulenza intercorsi tra la società e alcuni membri del C.d.a.; d) alle cospicue elargizioni ad enti e partiti politici.

I fatti indicati sono più ampiamente esposti nella relazione dell'attestatore, disponibile per i creditori ai fini della formazione del proprio convincimento.

Gli stessi fatti dovranno essere oggetto di un compiuto approfondimento da parte dell'organo commissariale al fine non solo di verificare la concreta esperibilità di azioni di responsabilità in uno scenario alternativo ma anche al fine di verificare se la *disclosure* eseguita dalla società sia stata effettuata in modo completo e di escludere, pertanto, la sussistenza di fatti occulti afferenti il patrimonio del debitore dotati di valenza decettiva per l'idoneità a pregiudicare il consenso informato dei creditori sulle reali prospettive di soddisfacimento.

In quest'ultimo caso l'organo commissariale dovrà immediatamente riferire al Tribunale nelle forme di legge per i conseguenti provvedimenti.

Deve pertanto rimettersi all'organo commissariale anche l'esame della situazione patrimoniale dell'impresa prospettata con la proposta di concordato ai fini di verificare che vi sia corrispondenza effettiva tra quella prospettata e quella realmente sussistente anche per effetto dell'analisi dei complessi rapporti infragruppo e dei relativi bilanci consolidati.



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

Restano ferme ed impregiudicate le autonome valutazioni che la Procura della Repubblica, già in possesso di adeguati dati documentali, potrà svolgere.

In quest'ottica appare passaggio imprescindibile, peraltro adeguatamente evidenziato anche nell'attestazione, un radicale cambio di *governance,* da realizzarsi prima del momento delle valutazioni definitive dei Commissari. Detto mutamento dovrà assumere caratteri tali da garantire al ceto creditorio l'assoluta autonomia della nuova *governance* che dovrà porsi in netta soluzione di continuità rispetto alla attuale gestione.

La società –come fortemente raccomandato anche dall'attestatore- dovrà inoltre munirsi di un *Chief Restructuring Officer,* dotato di requisiti di indipendenza e con una profonda conoscenza dei meccanismi di risanamento di azienda, per il tempestivo monitoraggio in continuo della fattibilità del piano e con capacità di individuare con immediatezza "*gli scostamenti tra gli obiettivi pianificati e quelli raggiunti al cui verificarsi occorrerà dare con immediatezza corso alle modifiche sostanziali alle intenzioni strategiche previste nel piano e finanche all'impiego di uno strumento di composizione della crisi ulteriore (accordi paraconcordatari nella forma dell'accordo di ristrutturazione ex art. 182 bis) o, in situazioni di particolare gravità, diverso (ricorso alla procedura di amministrazione straordinaria, ricorrendone i presupposti)"* (cfr. attestazione del 15.6.2021, pag. 46).

Alla luce delle considerazioni che precedono la debitrice può essere ammessa alla procedura di concordato.

La complessità della procedura induce a nominare una terna di commissari invece di un commissario unico, ciò nel duplice intento di migliorare l'efficienza dell'organo, in una procedura caratterizzata dalle rilevanti questioni sopra descritte. Tale orientamento non è infatti escluso dalla legge e si ispira per analogia ad altre ipotesi e procedure  ove il giudice si può avvalere di organi tecnici di gestione o liquidazione collegiali (dopo l'entrata in vigore del decreto correttivo 169 del 2007 si possono ad esempio nominare  più liquidatori per l'esecuzione della liquidazione nel concordato preventivo , mentre da anni ciò è possibile nelle amministrazioni straordinarie e nelle liquidazioni coatte amministrative).

Il collegio di commissari:

a) delibererà a maggioranza, in caso di disaccordo;
b) eserciterà i poteri di rappresentanza tramite almeno due commissari congiuntamente;
c) riceverà un compenso globale equivalente a quello di un singolo commissario (essendo i compiti svolti secondo il principio della migliore e più celere organizzazione del lavoro, e quindi non triplicando pedissequamente le stesse attività); da ripartirsi per un terzo a favore di ciascun commissario.

Va infine valutata l'**istanza** con cui MOBY ha chiesto di essere autorizzata ad un accordo con la controllata C.I.N. finalizzato alla regolazione delle modalità di pagamento del credito per noleggi da parte di C.I.N. maturato nei confronti di MOBY (e quindi debito prededucibile nella procedura di CIN).

L'accordo prevede una dilazione di pagamento dell'importo di euro 9,3 milioni, dovuto da C.I.N. a MOBY alla data del 31.1.2021 (di cui euro 8,3 milioni per noli relativi a mesi di



**TRIBUNALE DI MILANO**
**SEZIONE II CIVILE**

novembre e dicembre 2020 ed euro 1 milione per i noli relativi al mese di gennaio 2021) con previsione di pagamento in due *tranches* di eguale importo al 31 agosto 20221 e al 31 agosto 2023; accordo sospensivamente condizionato alla definitività del processo di omologazione e alla autorizzazione da parte del Tribunale.

Osserva il Tribunale che, in considerazione della magmaticità dei rapporti intercorrenti tra MOBY e CIN, alcuna autorizzazione può essere resa in questa sede senza il preventivo approfondimento richiesto agli organi commissariali (anche di CIN) in merito al complesso dei rapporti tra controllante e controllata e non essendo connotata l'istanza dal requisito dell'urgenza.

<div align="center">

**P.Q.M.**

</div>

visto gli art. 160, 161, 163, 163-bis, 166 L.F.

1) DICHIARA APERTA la procedura di concordato preventivo proposta dall'impresa **MOBY S.P.A. [C.F. 04846130633] con sede legale in MILANO, VIA LARGA N. 26**

2) DELEGA alla procedura la dott. Vincenza Agnese;

3) ORDINA la convocazione dell'adunanza dei creditori dinanzi al giudice delegato per la data del 13.12.2021, ore 10:00, aula B, primo piano, Palazzo di Giustizia di Milano, fissando il termine di giorni 30 dalla data del presente decreto per la comunicazione della data di adunanza, del decreto di ammissione ai creditori  sociali, unitamente alla proposta di concordato;

4) RAMMENTA:

    a) che la relazione del Commissario Giudiziale ex art. 172 L.F. dovrà essere depositata 45 giorni prima dell'adunanza in cancelleria e dovrà essere comunicata ai creditori;

    b) che non saranno considerati validi i voti pervenuti prima del deposito della relazione ex 172 L.F. essendo tale modalità di voto incompatibile con un consenso informato

5) RAMMENTA che ai medesimi devono essere eseguite le comunicazioni ai sensi della legge sull'agenda digitale, n. 221/2012 di conversione del decreto n. 179 del 2012[1];

6) NOMINA Commissari Giudiziali

<div align="center">

**DR. PIERO CANEVELLI**

**DR. TIZIANA GIBILLINI**

**AVV. MAURIZIO ORLANDO**

</div>

7) STABILISCE il termine di giorni quindici dalla comunicazione per il deposito da parte della ricorrente e della somma di euro 1.000.000, pari al 20% delle spese che si presumono necessarie per l'intera procedura, al netto delle spese già versate per la fase di cui al 161 sesto comma l.f., mediante versamento sul conto corrente intestato alla procedura presso Banca **INTESA SAN PAOLO S.P.A.**, chiarendo che il residuo andrà versato entro la data di scadenza del parere commissariale ex art. 180 L.F.;

---

[1] Si rammenta che dopo la comunicazione dell'indirizzo PEC del commissario al Registro delle Imprese entro dieci giorni dalla nomina, va redatto l'avviso ex art. 171 L.F. che deve contenere :

    1)   la data dell'adunanza ,

    2)   copia integrale della proposta di concordato  e del decreto di ammissione,

    3)   l'indirizzo di posta elettronica certificata del commissario ;

L'invito a ciascun creditore a comunicare entro il termine di 15 giorni l'indirizzo PEC al quale intende ricevere le  comunicazioni, e solo ove lo stesso non sia comunicato né reperibile *aliunde* presso il Registro delle Imprese l'avviso che si provvederà a depositare le comunicazioni in cancelleria con effetto liberatorio.



**TRIBUNALE DI MILANO**

**SEZIONE II CIVILE**

8) **DISPONE** che la società in concordato metta subito a disposizione dei Commissari Giudiziali le scritture contabili per gli adempimenti di annotazione di cui all'art. 170 l.f.;

9) **DISPONE** che la medesima concordataria consegni ai Commissari Giudiziali, entro e non oltre 7 giorni dalla comunicazione del presente decreto di ammissione, copia informatica o su supporto analogico delle scritture contabili e fiscali obbligatorie, per le finalità di cui all'art. 165 terzo e quarto comma;che il presente decreto sia pubblicato e notificato nelle forme previste dall'art. 166 l. fall., nonché mediante inserzione sia sul sito *internet* del Tribunale di Milano sia sul seguente giornale IL SOLE 24 ORE ; e che i Commissari Giudiziali notifichino, a norma degli artt. 88 e 166 l. fall., un estratto del presente decreto agli uffici competenti per l'annotazione sui pubblici registri;

10) **RAMMENTA:**

- che ai sensi dell'articolo 16-bis, comma 1, D.L. 18 ottobre 2012, n. 179, convertito in legge, con modifiche, dalla L. 17.12.2012, n. 221, a partire dal 30 giugno 2014, *"nei procedimenti civili, contenziosi o di volontaria giurisdizione, innanzi al tribunale, il deposito degli atti processuali e dei documenti da parte dei difensori delle parti precedentemente costituite ha luogo esclusivamente con modalità telematiche"*; e che pertanto i successivi atti (ovviamente non gli allegati) dovranno essere depositati in formato PDF.doc (file PDF nativo non acquisito a scansione), possibilmente accompagnati da una copia di cortesia (completa di allegati) per consentire agli altri membri del collegio l'esame di istanza ed allegati;

- che in caso di inottemperanza a tale vincolo processuale, il G.D. non procederà all'esame delle istanze/memorie prima di aver disposto la regolarizzazione;

- rigetta l'istanza ex art. 161, comma 7, l.f.

Così deciso in Milano, nella camera di consiglio della Seconda Sezione Civile, in data 24/06/2021 .

<table>
<tr><td>Il Giudice Estensore</td><td>Il Presidente</td></tr>
<tr><td>*Dott. Vincenza Agnese*</td><td>*Dott. Alida Paluchowski*</td></tr>
</table>



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

# The Court of Milan
## Second Civil Division
## Bankruptcy Division

meeting *in camera* in the persons of
Alida Paluchowski          President
Sergio Rossetti            Judge
Vincenza Agnese            Reporting Judge
issued the following

### RULING

HAVING REGARD TO the appeal for an arrangement with creditors filed under no. 48/2020 R.G. C.P.

### BY

**MOBY S.P.A. [tax code 04846130633], with registered office at VIA LARGA N. 26, MILAN**

APPELLANT

### NOTES

With an appeal filed on 30.6.2020, MOBY S.P.A. filed an application for admission to an arrangement with creditors with reservations and, on 29.3.2021, it filed a full application, subsequently supplemented.

An application for bankruptcy (pre-bankruptcy application no. 684/2020) is pending, filed on 10.8.2020 by several bondholders (€300,000,000 7.75% Senior Secured Notes Due 2023) joined to this application for an arrangement with creditors.

The timeline that led to the filing of the proposal and plan brought to the Court's attention can be summarized as follows:

- On 30 June 2020, the appellant filed an application for an arrangement with creditors with reservations pursuant to Article 161, paragraph 6, of the Bankruptcy Law, requesting the granting of the maximum period provided by law, amounting to 120 days, to file an application for the approval of the restructuring agreements or, alternatively, to file a proposed arrangement with creditors on a going concern basis;

- With a ruling of 9 July 2020, the Court granted the periods referred to in Article 161, paragraph 6, of the Bankruptcy Law, up to 28 October 2020 for filing the plan and the proposed arrangement with creditors, as well as the documentation provided for by paragraphs 2 and 3 of that same Article 161 of the Bankruptcy Law, or an application pursuant to Article 182-*bis*, paragraph 1, of the Bankruptcy Law, requiring the Company to provide the information referred to in Article 161, paragraph 8, of the Bankruptcy Law;

- On 23 October 2020, the appellant filed an application for an extension of the period granted, on which account the Court granted an extension of the period pursuant to Article 161, paragraph 6, of the Bankruptcy Law, up to 28 December 2020;

- The Company also filed an application pursuant to Article 9, paragraph 4, of Decree Law No. 23 of 8 April 2020, as converted with Law No. 40 of 5 June 2020 (the so-called "Liquidity Decree"), in order to request the granting of a further extension of the aforesaid period by 90 days;

**EXHIBIT**

**Onorato C-2**



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

- Accepting the application, the Court granted a period up to 29.3.2021, considering that "*in accordance with the reasoning of the provision applied in these proceedings to offer chances of rescue to companies in crisis, a necessary adaptation has to be made between the protection of the creditors' rights and the consequences deriving from suspension of the proceedings in process and the opening of liquidation (Moby s.p.a. being subject to an application for bankruptcy), on the point of a possible interruption of public services and the loss of numerous jobs with inevitable negative repercussions on the same body of creditors who would benefit from the rescue and appreciation of the assets*" (cf. ruling of 29.12.2020 produced);

- On 29 March 2021, MOBY filed a proposal for an arrangement with creditors on a going concern basis, pursuant to Article 186-*bis* of the Bankruptcy Law, together with the plan, the documentation required by law and the report of the independent professional Riccardo Ranalli, meeting the requirements laid down by Article 67, paragraph 3, letter d), of the Bankruptcy Law, prepared pursuant to Articles 161, paragraph 3, and 186-*bis* of the Bankruptcy Law, spontaneously supplemented on 27.4.2021 (while awaiting the filing of the Judicial Commissioners' opinion);

- With an order of 3.5.2021, the Court raised numerous criticisms of the proposal and plan, granting a period of 15 days as from notification thereof to file additions and clarification;

- On 19.5.2021, the company filed an additional statement in order to offer clarification and the additional information requested in the order of 3 May 2021;

- With subsequent statements and additional information produced (the latest of which dates back to 16.6.2021), MOBY S.P.A. supplemented and further amended the proposal and planned arrangement with creditors, as a result of facts emerging, including the service by Tirrenia in A.S. of a summons requesting a judgment against MOBY, pursuant to Article 2900 of the Italian Civil Code, and pursuant to Article 2497 of the Italian Civil Code, which will be dealt with below.

During the course of the proceedings, the Judicial Commissioners (Tiziana Gibillini and Maurizio Orlando) monitored the company's activities and examined the proposal, the plan and the documentation, issuing many opinions (the last dated 22.6.2021).

The documentation and the evidence acquired during the course of the examination indicate that the application satisfies the conditions laid down by Article 160 of the Bankruptcy Law, and in particular:

- The appellant company is a company that may be subject to bankruptcy, as it meets the requirements laid down by Article 1 of the Bankruptcy Law;
- It is in a situation of crisis, if not insolvency, fully argued by the appellant itself.

In particular, MOBY SPA is a company subject to the direction and coordination of the sole shareholder Onorato Armatori S.r.l. pursuant to Articles 2497 *et seq.* of the Italian Civil Code and is, in turn, the parent company of COMPAGNIA ITALIANA DI NAVIGAZIONE S.P.A., also in proceedings for an arrangement with creditors.

The Onorato Group operates in three main business categories:

Ferries – the fleet is composed of 44 ferries, through which the Onorato Group companies offer passenger, vehicle and goods transportation services; the company states that this is its most important business unit, which generates the Onorato Group's main income;

Tugs – the Onorato Group companies operate a fleet of 16 tugs at nine Italian ports (eight of which are in Sardinia), through which they provide towing services both within the ports and in the open sea, including port safety operations consisting of assistance for ships while maneuvering and providing assistance in the event of fire and/or incidents;



**COURT OF MILAN**
**SECOND CIVIL DIVISION**
_____

Port operations – through the companies Sinergest, L.T.M., CPS S.r.l., Tuscany Terminal S.r.l. and Porto di Livorno 2000 S.r.l., which hold the relevant concessions on an exclusive basis issued by the competent Italian port authorities.

The overall structure of the Onorato Group and the MOBY subgroup is shown below:



The applicant states the following as the main causes of the crisis:

a) Reduction in income: the start-up of the routes from and to Sardinia (particularly the Livorno-Cagliari and Livorno-Olbia stretches) by group competitors, with the result that "this increase in supply has given rise to an inevitable decrease in tariffs, thus causing a real drop in list prices among the various operators in the goods sector in particular" with the resulting reduction in average revenues. In particular, the company states that "*the fact that, unlike other shipping companies, the Onorato Group companies were required to operate the routes throughout the year, led to a worsening of the negative effect deriving from the reduction in average revenues recorded over the summer. To maintain the market shares held by the Onorato Group companies overall and in order to respond to the competition on the routes from and to Sardinia, over the course of 2017 it therefore became necessary to extend the routes to Sicily in the goods sector. The initiation of several Sicilian routes, such as the Genoa-Livorno-Catania and Malta routes, that began in November 2016, and the Naples-Catania route, undertaken in June 2018, produced economic effects typical of start-ups*";



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

b) Increase in costs, mainly bunker and port costs, that could not be passed on to the final users by means of an increase in tariffs owing to the competition, thus causing a contraction in the profit margin on numerous routes;

c) The initiative, defined by the appellant as "speculative", consisting of the notification in September 2019 of an application for bankruptcy by a group of funds classified as MOBY's creditors as they each hold, in an equivalent amount of more than €100,000.00, a portion of the bonds totaling €300,000,000.00 known as "*7.75% Senior Secured Notes due in 2023 (ISIN: XS1361301457 and XS1361300996)*" issued on 11 February 2016 and admitted to listing on the Luxembourg Stock Exchange: the company states that, despite the rejection of the application for bankruptcy, this led to harsher operations for the company with negative repercussions on several commercial transactions;

d) Effects of the Covid-19 pandemic which, at the date of the appeal pursuant to Article 161, paragraph 6, of the Bankruptcy Law, have caused a considerable reduction in passenger bookings.

The company states that it has made contact with the credit institutions and with the bondholders holding the largest share of the company debt, amounting to some €500,000,000 overall (backed by a mortgage on the C.I.N. fleet for €77 million) to implement the debt restructuring, but that such contact did not lead to an agreement being reached with the resulting final decision taken by the company management to resort to an arrangement with creditors on a going concern basis to overcome the crisis under the terms indicated below.

The customary documentation provided for by Article 161 of the Bankruptcy Law produced to support the application provides enough positive points for the summary judgment requested in these proceedings, for a full and detailed review over the course of the proceedings, based on the assessments made by the Judicial Commissioners below.

In particular:

a) The appeal has been duly signed by the legal representative of the appellant company;

b) The appeal contains a report on the company's asset, economic and financial position;

c) An analysis and estimate of the activities and the list of creditors have been produced;

The proposed arrangement with creditors and the documentation are accompanied by the report of a professional meeting the requirements laid down by Article 67, paragraph 3, letter d), of the Bankruptcy Law (Riccardo Ranalli) who noted the veracity of the accounting data and the feasibility thereof.

The appellant company based its proposed arrangement with creditors on a plan drawn up on a going concern basis that has undergone changes and additions also due to the (inescapable) interference with the means of resolving the crisis finally identified by the subsidiary C.I.N. in the arrangement with creditors on a going concern basis and through the effect of the service of two summonses by Tirrenia S.p.a. (the main creditor of the company C.I.N.).

In order to offer creditors the fullest information, it therefore appears advisable to summarize the proposal and the planned arrangement with creditors in order to understand the course taken by MOBY to reach the current form of the proposal and of the plan.

The original formulation of the plan was based on the following provisions:

a) Full payment of the creditors for pre-deductible debts;

b) Full payment of the preferential creditors backed by a lien pursuant to Article 552 of the Italian Shipping Code (within one year of approval);



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

c) Full payment of the creditors backed by a general lien (within one year of approval); as well as the further body of creditors subdivided into the following classes (pages 12-14 of the proposal of 29 March 2019):

d) Class I (preferential creditors secured by pledge and mortgage) → paid within the limits of capacity of the assets on which the cause of pre-emption is established pursuant to Article 160, paragraph 2, of the Bankruptcy Law, and admitted to voting as payment is made within 36 months and therefore over a period of more than one year;

e) Class II (financial creditors backed by a special lien) → percentage of payment in an amount of 13-19% owing to downgrading to unsecured within a period of 48 months;

f) Class III (unsecured trade creditors) → percentage of payment in an amount of 15-21% over 48 months;

g) Class IV (owing to the possible credit by recourse by the Fund through the payment of the registered creditors, credits guaranteed by CIN up to a limit of €77,000,000) → percentage of payment in an amount of 30% (in the event of recourse by an investment fund whose intervention, at the time of drafting the original plan, should have established the structure of the restructuring agreement that C.I.N. hoped to conclude through the agreement with its main creditor Tirrenia S.p.a. in A.S.).

Based on the original structure of the plan, the assets were mainly composed of the following:

- Continuity cash flows based on the business plan for the period 2021-2025;
- Sale of the tugs branch;
- Sale of several assets considered to be non-strategic (five ships) following the inclusion in the fleet of two "Chinese" ships over the course of the plan;
- Sale of properties in Milan and Olbia;
- Contribution made by the shareholder Onorato Armatori S.r.l. (a contribution that led to the release of the voluntary pledge, placed by Onorato Armatori s.r.l. on the capital of MOBY S.p.a.).

With the ruling of 3.5.2021, the Court, again based on the opinion issued by the Commissioners, raised several criticisms of the proposal and the plan as briefly summarized below:

a) Criticism regarding the classes of creditors identified owing to the incorrect identification of the amount of payments made over more than a year to the preferential creditors and the resulting calculation of the economic loss on which the preferential creditors should have voted and on the composition of the individual classes;

b) Criticism on the sale of the tugs branch, also considering that the cash flow deriving from the sale constitutes a significant portion of the financial requirement for the year 2022;

c) Criticism on determining the continuing cash flow, pointing out how, in short, following a considerable contraction of the fleet and the resulting reduction in routes, an increase in revenues was anticipated over the course of the plan compared to those achieved in the year 2019, an increase also deriving from an increase in tariffs and a contraction of bunker costs; it was pointed out in the ruling that the uncertainties over the actual amount of revenues that could be achieved based on the company's assumptions were partly confirmed by the witness himself in the supplementary report in noting that he had made an analysis of the current trading with regard (i) to turnover, costs and EBITDA for the period January-February 2021 and (ii) to passenger and goods revenues in the period January 2021-19 April 2021, comparing the overall "monthly" figures with those of the plan for the same period, indicating a negative trend

*Page 5*



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

both of passenger revenues and of goods revenues compared to that indicated by the plan;

d) With regard to the cash flows on a going concern basis, the company was asked to clarify how the economic effect thereon of the disbursement due to the acquisition over the course of the plan by the company F.lli Onorato Armatori S.r.l. of two "Chinese" ships in the course of construction, disbursements actually payable by MOBY by means of a system of charter parties with advance payments, would not give rise to erosion of the resources intended for the payment of creditors and it was also asked to clarify the economic effects deriving from the overall transaction planned that included MOBY's acquisition of shares in F.lli Onorato Armatori S.r.l;

e) Criticism over the contribution made by Onorato Armatori S.r.l. of €2,000,000 for the "release of the voluntary pledge placed by Onorato Armatori S.r.l. on the share capital of Moby", the Court noting an illegal contraction of the guarantees provided for creditors in that provision;

f) Criticism on the provision by the company for the abolition of the creditors' guarantees (even those granted by third parties) in the event of a favorable vote being cast, a clause clearly in breach of Article 184 of the Bankruptcy Law;

g) Criticism on the point of determining the assets deriving from the sale of two properties, as an increase had been determined compared to the expert estimates;

h) Criticism on the point of determining the assets deriving, in an alternative scenario, from bringing actions for liability against the management body, the board of statutory auditors and the independent auditors owing to the reprehensible actions committed by the company management and disclosed by the company in the proposal and in the testimony.

With the statement of clarification of 19 May 2021, the company, even including the observations made by the Judicial Commissioners and by the Court, amended the proposal and the plan, providing for a strengthening of the expected cash flows and in particular:

• It clarified the dynamics and the assumptions on the basis of which the Business Plan 2021 – 2025 had been drawn up, with particular reference to: (i) the passenger and goods traffic estimates and the relative revenues, taking into account the tariff estimates and the operating interaction with CIN; (ii) charter fees; (iii) the estimate of the components of the operating costs; and (iv) the composition of the cash flows deriving from the transfer of the tugs branch;

• It amended the amount and the terms of the shareholder's contribution (i) by increasing it from €2 to €6 million; (ii) by pointing out that the relevant resources would be obtained by means of the sale of a property complex situated in Porto Cervo that would be available shortly; and (iii) it apportioned that contribution to all the company creditors without any waiver of the pledge on the MOBY shares in return;

• It inserted the anticipated collection, over the course of 2021, of the amount of €6.7 million to be apportioned to the fund set aside pursuant to Article 89 of Decree Law No. 104 of 14 August 2020, to offset the fall in passenger traffic for maritime companies following the Covid-19 pandemic;

• It aligned the values expected from the sale of the properties, as provided for in the Plan, with the (lower) values expressed by the expert appointed, Luca Mutti, with an estimated reduction in the amount collected of €1.88 million;

• It amended the timing of payment of the special preferential creditors backed by mortgages and pledges (class 1) and the resulting cash flows (from 2021 to 2022);

• It provided that the income deriving from the sale of the tugs branch would be deposited in an escrow account to be fully assigned for the benefit of the creditors included in the



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

arrangement and to be released immediately after the approval planned in 2022. Following the filing of the statement under the foregoing terms, the appellant was subjected to the legal action brought by Tirrenia S.p.a. in A.S., a creditor of C.I.N.'s, for an amount equal to €180 million.

In particular, Tirrenia brought an action pursuant to Article 2900 of the Italian Civil Code, subrogating CIN in respect of MOBY for the claims held by the former against the latter, disputing the deferral pursuant to Articles 2467 e 2497-quinquies of the Italian Civil Code and affirming satisfaction of the requirements pursuant to Article 2900 of the Italian Civil Code. The request refers to the amount of the claims resulting from MOBY's financial statements as at 31 December 2019, indicated at around €128.6 million, with a request for an order pursuant to Article 186-ter of the Italian Code of Civil Procedure for that part of the claim which, according to the plaintiff's reconstruction, even along the lines of the considerations raised in the opinion of Prof. Stanghellini (issued at the request of MOBY itself), was not subject to deferral, equal to €43.8 million; in the alternative, Tirrenia in A.S. brought an action for liability against MOBY and/or Onorato Armatori S.r.l. pursuant to Article 2497 of the Italian Civil Code, requesting compensation for the loss sustained, which corresponds to that portion of its claim that it will not manage to collect and, in the alternative, to the loss of opportunity suffered due to non-payment of the claim itself.

On 31.5.2021, a second summons was served on the company, served by Tirrenia in A.S. on MOBY, CIN and all the banks forming the pool in the finance transaction in relation to which Tirrenia requested the declaration of inefficacy, pursuant to Article 2901 of the Italian Civil Code, of the guarantees issued by CIN in the sum of €77,000,000 (to guarantee repayment of the debt held by MOBY in respect of the credit institutions and the bondholders).

On 15.06.2021, MOBY therefore filed a statement amending the proposal and the plan which included:

• The economic effects of the waiver, subject to approval, by several members of the board, of the fees decided for the year 2021 (€0.977 million net of taxes);

• The provision, in view of the potential liability emerging from the aforesaid dispute brought by Tirrenia (particularly from the case regarding the action for compensation pursuant to Article 2497 of the Italian Civil Code), for the apportionment of the amount of the maximum risk, estimated at €144 million, and the treatment of this liability in the same way as the other unsecured creditors (disputed);

• The reduction, to ensure that the relevant requirement is covered without affecting the financial sustainability of the plan, of the percentages of payment provided for the financial creditors downgraded from 13% to 9% and for the other unsecured creditors from 15% to 12%;

• The strengthening of the governance and control systems by monitoring implementation of the Plan as well, based on the commitments made by Onorato Armatori S.r.l., the sole shareholder in MOBY, in a letter dated 3 June 2021.

The proposal at 15.06.2021 therefore provides for the following:

- Full payment of creditors for pre-deductible debts;

- Full payment of the general preferential creditors;

- Payment of the creditors holding a special lien pursuant to Article 552 of the Italian Shipping Code in the amount indicated in the report pursuant to Article 160, paragraph 2, of the Bankruptcy Law, with the provision to downgrade to unsecured the claim or part thereof for which the asset forming the subject of the special lien proves insufficient;

- Payment of the mortgage creditors in the amount indicated in the report pursuant to Article 160, paragraph 2, of the Bankruptcy Law, with the resulting downgrading to unsecured



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

of that part of the claim not paid off by the mortgage and provision for suspension over more than one year for the recognition of their claim (unchanged);
- Recognition in favor of the mortgage creditors of any additional sum deriving from the sale of the assets over the course of the plan compared to the value identified in the expert valuation pursuant to Article 160, paragraph 2, of the Bankruptcy Law;
- Partial payment of the mortgage creditors downgraded to unsecured in an amount of 9%;
- Partial payment of the original unsecured creditors (and a special creditor pursuant to Article 552 of the Italian Shipping Code) downgraded to unsecured in an amount of 12%;
- Recognition in favor of the unsecured creditors of a further percentage equal to 1.1% in the event of the release of the provision for disputes;
- Maintenance of minimum cash over the course of the plan at least equal to the possible amount required to pay off the claims currently deposited in the fund in an amount of 100% for preferential provisions, 9% for downgraded unsecured provisions, 12% for other unsecured provisions and 12% for the provision for the Tirrenia A.S. dispute.

The overall structure of the proposal through the effect of all the changes and additions is shown in the table below with regard to the payments planned and the resources allocated thereto:

| Moby SpA – Financial report (€/000) | Adjusted balance 30.06.20 | % payment | Withdrawal | Total payments | 2021BP | 2022BP | 2023BP | 2024BP | 2025BP |
|---|---|---|---|---|---|---|---|---|---|
| **BoP cash** | | | | | **28,703** | **90,505** | **40,201** | **40,840** | **31,749** |
| Operating cash flow | | | | | 15,791 | 37,112 | 23,098 | 17,224 | 22,565 |
| Income from sale of ships | | | | | - | - | 94,294 | - | 38,457 |
| Income from sale of tugs branch | | | | | 50,000 | - | - | - | - |
| Income from sale of other assets | | | | | 6,302 | - | - | - | 4,813 |
| Provision pursuant to Article 89 of Decree Law 104/2020 | | | | | 6,700 | - | - | - | - |
| Increase in capital | | | | | - | 6,000 | - | - | - |
| Payments for Chinese ships | | | | | (11,816) | (38,600) | (7,460) | - | - |
| **Total liquidity at debt service** | | | | | **95,680** | **94,957** | **150,134** | **58,064** | **97,584** |
| Pre-deduction | - | - | - | 11,515 | (5,175) | (4,049) | - | - | (1,000) |
| Special lien | 1,303 | 100.0% | - | 1,303 | - | (1,303) | - | - | - |
| Preferential bank debt | 61,625 | 100.0% | - | 61,625 | - | (11,834) | (36,832) | (8,868) | (4,092) |
| Preferential bond debt | 121,241 | 100.0% | - | 121,241 | - | (23,281) | (72,462) | (17,447) | (8,050) |
| General lien | 14,289 | 100.0% | - | 14,289 | - | (14,289) | - | - | - |
| Unsecured bank debt | 101,374 | 9.0% | (92,250) | 9,124 | - | - | - | - | (9,124) |
| Unsecured bond debt | 199,441 | 9.0% | (181,491) | 17,950 | - | - | - | - | (17,950) |
| Unsecured debt | 36,743 | 12.0% | (32,334) | 4,409 | - | - | - | - | (4,409) |
| **Total liabilities / payments** | **536,016** | | **(306,076)** | **241,455** | **(5,175)** | **(54,756)** | **(102,294)** | **(26,315)** | **(44,624)** |
| **EoP cash** | | | | | **90,505** | **40,201** | **40,840** | **31,749** | **52,960** |
| Formation of escrow | | | | | (56,302) | - | - | - | - |
| **EoP available cash** | | | | | **34,203** | **40,201** | **40,840** | **31,749** | **52,960** |
| Provision for preferential creditors included in the arrangement | 6,959 | 100.0% | - | 6,959 | - | 6,959 | 6,959 | 6,959 | 6,959 |
| Provision for downgraded mortgage creditors | 19,384 | 9.0% | (17,640) | 1,745 | - | 1,745 | 1,745 | 1,745 | 1,745 |



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Provision for unsecured creditors | 38,121 | 12.0% | (33,546) | 4,575 | - | - | - | - | 4,575 |
| Earn-out provision | 30,000 | 12.0% | (26,400) | 3,600 | - | - | - | - | 3,600 |
| Tirrenia dispute provision | 144,000 | 12.0% | (126,720) | 17,280 | - | - | - | - | 17,280 |
| Provision for reclassified deferrals | 69,630 | 1.0% | (68,934) | 696 | - | - | - | - | 696 |
| **Total provisions for creditors included in the arrangement** | 308,095 | - | (273,240) | 34,855 | - | 8,704 | 8,704 | 8,704 | 34,855 |
| **Residual cash following provisions for creditors included in the arrangement** | | | | 34,203 | 31,497 | 32,136 | 23,045 | | 18,105 |

The version of the proposal as at 15.06.2021 does not provide for any change in relation to the previous version dated 19.05.2021 with regard to the following:
- the number and composition of the classes, including the estimate for class 4 (figurative);
- the timing of payments (if not within the limits indicated above);
- the assumptions and estimates made in the Business Plan 2021 – 2025.

The company provided for the formation of three certain **classes** and two uncertain classes, indicating the following in the last amended proposal:

**Class 1 (voting)**: composed of creditors backed by a special mortgage and pledge, to whom payment is planned within the limits of the capacity of the assets on which the lien is placed, pursuant to Article 160, paragraph 2, of the Bankruptcy Law, within a period of 36 months as from approval of the arrangement with creditors, without prejudice to the possibility of possible advance payments following the sale of the assets forming the subject of the guarantee, admitted to voting on account of the aforesaid suspension, beyond the year referred to in Article 186-*bis*, paragraph 2, letter c), of the Bankruptcy Law.

In the additional statement, the company clarified that that part of the preferential claim subject to suspension of more than a year may be quantified at around €98,633,000 and that voting due to the loss of assets should take place on an amount equal to €15,000,000.00.

**Class 2 (voting)**: composed of financial creditors backed by a special **mortgage** and pledge on the company's assets, for which the proposal provides, pursuant to Article 160, paragraph 2, of the Bankruptcy Law, for non-full payment, owing to the insufficiency of the assets on which the lien is placed, for that part of their claim downgraded to unsecured pursuant to Article 177, paragraph 3, of the Bankruptcy Law, which will be paid in the minimum guaranteed amount equal to 9% of the respective claims, which may be increased up to the non-guaranteed maximum amount of 19% of the respective claims, within a period of 48 months as from approval of the arrangement and, in any event, not before the creditors backed by a general and special lien have been paid, apart from previous distributions; this class includes the holders of claims included in the unsecured financial provisions, who will receive the same treatment;

**Class 3 (voting)**: composed of all the remaining unsecured trade creditors, as they are not backed by legitimate pre-emptive causes from the time their respective claims have emerged (including the sole trade creditor backed by the lien referred to in Article 552 of the Italian Shipping Code placed on an asset of insufficient value, as well as that part of the claim held by way of VAT collected at source, backed by the lien provided for by Article 2758 of the Italian Civil Code, but downgraded to unsecured owing to the non-existence of the assets on which the relevant liens were placed), which will be paid in the guaranteed minimum amount equal to 12% of the respective claims, which may be increased up to the non-guaranteed maximum amount of 22% of the respective claims, within a period of 48 months as from the expected



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

approval of the arrangement and, in any event, not before the creditors backed by a general and special lien have been paid, apart from previous distributions; this class includes the holders of claims included in the unsecured commercial provisions, who will receive the same treatment. Besides these classes, the company provides for a **Class 4**, defined by the company as "figurative", which will include the recourse claim that CIN (or a third party) will hold against MOBY following the possible payment of the mortgage creditors who have registered a mortgage on the fleet operated by the subsidiary (*i.e.*, credit institutions and bondholders), as provided for in the proposal and in the underlying plan of the arrangement with creditors filed by CIN on 24 May 2021 who will be paid in the guaranteed amount equal to 30%, in a single instalment by the financial year 2026.

The claims made by CIN and MOBY and by other Onorato Group companies were considered to be deferred, pursuant to and for the purposes of Articles 2467 and 2497-*quinquies* of the Italian Civil Code and, consequently, no payment was planned for them. As an alternative, the company provides for a payment equal to 1% of the respective claims within a period of 48 months as from approval of the arrangement and, in any event, not before the creditors backed by a general and special lien have been paid, apart from previous distributions if the Court were to rule out deferral (possible **Class 5**).

With regard to the provision of the foregoing classes, the Court is asked to give its opinion pursuant to Article 163 of the Bankruptcy Law on the formation criteria, the creditors having to be subdivided (if provided for) based on the uniformity of their legal positions and economic interests.

According to the teaching of the Supreme Court (Court of Cassation no. 9378/2018 which confirms the previous Court of Cassation judgment no. 13284 of 26 July 2012), "*the uniformity of the legal positions relates to the objective nature of the claim and concerns the intrinsic qualities of the claims, taking into account their characteristic legal features, the unsecured or preferential nature, the possible existence of disputes over the amount or quality of the claim, and the presence of a possible provisional enforcement order.*

*As the uniformity of the economic interests is a criterion aimed at guaranteeing equal conditions at a substantive level, it relates to the source and to the socio-economic type of the claim (banks, suppliers, employees, etc.) and the particular benefit claimed by its holder (depending for example on the amount of the claim in relation to the overall debt, the presence of co-debtors or the possible interest in continuing the relationship with the business in crisis), in order to guarantee greater distribution in the presence of conditions of uniformity of position, according to rules of reasonableness.*

*It is recalled that the criteria in question, which are distinct and concurrent, must be examined together in order to check the uniformity of the claims grouped together, if the business intends to provide for a subdivision into classes; such uniformity cannot, however, be preached in terms of absolute identity or coincidence (given that, if that were possible, it would only be possible to form classes in the presence of claims with exactly the same characteristics), but consists of the concurrence of principal common features of prevailing importance that render the differentiating aspects of secondary significance and justify a common type of payment of the positions included within the same class based on criteria of reasonableness (or merit, pursuant to Article 1322 of the Italian Civil Code)*".

Beyond the systematic choices, variously defined by doctrine on the subject and by case law on the merits, it is worth mentioning that the concept of uniformity must be read in terms of "prevailing affinity" and not absolute coincidence, as this latter reading, besides being too rigid, would allow excessive fragmentation of the body of creditors called upon to vote.

*Page 10*



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

Applying the aforesaid principles, the Court reaches a positive conclusion on the criteria of formation of the first two classes of creditors formed by the creditors themselves (banks and bondholders) admitted to voting in the first class on account of the suspension requested of them and in class 2 for that portion downgraded as provided for by Article 177, paragraph 3, of the Bankruptcy Law.The grouping of bondholders and credit institutions into a single class does not present any obvious criticism in view of the overall financial nature of the debt, even if defined differently, for the bond loan, by way of principal. The overall debt amounting to around €500,000,000 (see the table of liabilities below for the exact figure) presents a functional unity as it originated from the LBO between MOBY S.p.a and Onorato Armatori S.p.a. in the year 2016 within the scope of which, on the one hand, Onorato Armatori S.p.A. (subsequently merged into MOBY) issued a bond with a 7-year term for an amount equal to €300 million and, on the other, Onorato Armatori S.p.A. (which is now MOBY) received a bank loan, with a 5-year term, for an overall amount of €200 million. A common contractual source therefore also exists which aims to govern several aspects of the relations existing between banks and bondholders in relation to the overall credit supplied to the company in debt.

In its additional statement dated 19.5.2021, MOBY clarified, on the specific points raised by the Court, that the individual relations (with the credit institutions on the one hand and the bondholders on the other) "_were then closely linked to each other by a third agreement, known as the "Intercreditor Agreement", concluded on the same day on which the Indenture was formalized (11 February 2016), in which all the parties involved (i.e., the Onorato Group companies, the credit institutions and the bondholders) specifically regulated those aspects, which were essential for the correct outcome of the transaction, including, for example, the order in which the payments made by the debtor company would be allocated, the procedure for payment of the creditors based on the guarantees issued by the debtor and by the companies in its group, the procedure for the granting of further loans in favor of the Onorato Group companies, the option right held by the bondholders to acquire the claims held by the banks, etc._".

The entire amount of the claim is also backed by the same guarantees provided both on the MOBY's assets and fleet, and on the fleet of the subsidiary Compagnia Italiana di Navigazione S.p.a. for an amount equal to €77,000,000.00.

Consequently, the body of bondholders and credit institutions, based on the items of assessment supplied to the Court and reserving the examination of any further evidence that has not yet emerged, has to be considered to be sound as the two types of creditors present common features, regarding the legal position and economic interests, which prevail over the different features.

Placing the same creditors in two separate classes is permitted as they vote in the first class on the preferential claim arising from the economic loss deriving from the payment over more than one year and in the second class they vote as unsecured creditors through the effect of the downgrade applied; and therefore the subdivision is justified on account of the different characteristics which the same claim assumes through the effect of the insufficiency of the assets on which the lien is placed.

With regard to the bondholders' particular voting mechanisms, the company clarified that they are called upon to vote within the scope of the relevant meeting pursuant to Article 2415, paragraph 1, point 3, of the Italian Civil Code and that the result of the vote will be given during the course of the creditors' meeting by the common representative of the bondholders' meeting. The Court is not responsible for establishing, at this stage, the criteria and the majorities for valid voting within the scope of the meeting, but it should be recalled that the classification is



**COURT OF MILAN
SECOND CIVIL DIVISION**

_____

designed to facilitate the debtor's attempt to achieve the necessary consensus for the approval of the arrangement, so that placing the bondholders (with a larger portion of credit than that of the financial creditors) in the same class as the credit institutions does not appear to conflict with the general clause on good faith as the company fully assumes the risk of failure to achieve the majorities in classes 1 and 2 through the effect of a vote against and/or invalid vote cast by the bondholders.

Class 3 is correctly formed by original unsecured creditors (except for an insufficient and therefore downgraded shipping lien).

The company plans a **Class 4**, defined by the company as "figurative", which will include the recourse claim that CIN (or a third party) will hold in respect of Moby following the possible payment of the mortgage creditors who have registered a mortgage on the shipping fleet operated by the subsidiary (credit institutions and bondholders), as provided for in the proposal and in the underlying plan for the arrangement with creditors filed by CIN on 24.5.2021, which will be paid in a guaranteed amount equal to 30%, in a single instalment by <u>the financial year 2026</u>.

The Court cannot make any assessment of a class that is currently *non-existent* whose payment is planned beyond the timespan of the plan (as also indicated by the witness on page 295 of the initial testimony dated 29.3.2021).

Finally, the company is planning a further entirely possible class to include the claim held by CIN and by other group companies against MOBY. The appellant considers the entire debt to be deferred through the effect of the intra-group relations and has not provided for any payment. As an alternative, it provides for a payment equal to 1% within a period of 48 months as from approval of the arrangement if the Court were to rule out deferral (with the resulting formation of a further class).

Based on the assumption of deferral, the company recalls an opinion filed (known as the "Stanghellini opinion") which briefly states that "*1) both CIN and Moby, companies subject to the same direction and coordination activities, are currently in a situation of economic and financial imbalance provided for by Article 2467 of the Italian Civil Code, and Moby has been in that situation at least since 2018; 2) on account of the reference contained in Article 2497 quinquies of the Italian Civil Code, Article 2467 of the Italian Civil Code applies to loans between companies subject to the direction and coordination activities of the same parent company, and therefore also to the "loans" made by Moby to CIN and vice versa; 3) pursuant to Article 2467 of the Italian Civil Code, "loans" are also deemed to include the trade receivables that one of the two companies failed to demand when the other was already in a situation of imbalance referred to in Article 2467, paragraph 2, of the Italian Civil Code; 4) deferred claims cannot be paid by a company finding itself in the aforesaid position, for as long as it remains in that position, and, since they are not due, they cannot be offset against other deferred claims or against the trade receivables deriving from current operations and are not, therefore, deferred; 5) irrespective of the group companies' economic and financial conditions, reciprocal trade receivables are, however, offset automatically, during the period of coexistence, as they arise. The difference between the reciprocal claims not offset may be deferred in the presence of the objective, chronological conditions described above; 6) the arithmetic balance of the reciprocal sums receivable and payable, amounting to €52,314,338 as at 31 December 2019 and to €50,916,936.05 as at 31 March 2020, should be deemed to be fully deferred*".

The Court is not unaware that the legislator adopted a broad concept of loan that disregards the forms used and that should be identified with regard to the specific interest underlying the relevant transaction, even if not resulting in the provision of a sum of money, and that the



**COURT OF MILAN
SECOND CIVIL DIVISION**

_____

specific cause of the loan may be concealed in apparently commercial relations (in the case, for example, of payment deferrals falling outside commercial practice).

Article 2467-quinquies of the Italian Civil Code extends the provision of Article 2467 of the Italian Civil Code to loans granted to the company by the party carrying out direction and coordination activities in its respect or by other parties subject thereto, therefore defining the specific case to which the deferral system is intended to be applied, in the event of intra-group loans, without prejudice, at an objective level, to the requirement laid down by Article 2467 of the Italian Civil Code. The crisis code defines the scope of application of the so-called "intra-group deferral", Article 292, paragraph 1, providing that "claims held by the company or the entity or the natural person carrying out direction or coordination activities, even following the enforcement of guarantees, against the companies subject thereto, or held by the latter in respect of the former, based on loans contracted after the filing of the application giving rise to the commencement of judicial liquidation proceedings or in the previous year, shall be deferred in relation to the payment of the other creditors". The wording of this provision confirms, albeit merely to an interpretative extent at this stage, the superfluous nature of the need to identify a direct participating link between the companies between which the loan is arranged.

Having consequently considered that the deferral system may also be applied in the abstract to companies that are not shareholders in the company financed (as in the case of CIN, which is 100% controlled by MOBY, whose sole shareholder is, however, Onorato Armatori), but subject thereto, the Court notes that, in this case, it is not yet possible to establish whether CIN's credit position is deferred or not.

In fact, if the _ratio_ for the provision of the deferral system is to prevent the risk of company insolvency being transferred to the company's external creditors and to neutralize the asymmetry of information between the other unaware creditors and the shareholders who, having the benefit of information deriving from their participation in the shareholding structure, could "precede" the other creditors in the collection of their claims (from the loan), one cannot rule out the possibility that, in the absence of offsetting benefits between companies of the same group, the deferral system may result in a case of abuse of the direction and coordination position.

The assessment thereof must necessarily be referred to the investigations requested of the commissioners as these intra-group loans should not be assessed in isolation but in the overall disclosure made by the company in the proposal and in the plan on the reprehensible actions originating from the leveraged buyout of 2016 referred to and which will be considered later, having to assess whether, on account of the specific corporate events, the loans made to the parent company, if direction and coordination activities are involved, may, in the presence of abuse, lead to liability for violation of the principles of correct business and corporate management borne by the parent company, accompanied by that of the directors of the financing subsidiary, who have specific duties to monitor the financial position of the parent company and, in particular, the sustainability and repayability of the loan granted to it.

The net position emerging from the Stanghellini opinion as indicated above should in any event be examined within the scope of the broader assessment of the reliability of the financial statements of the individual group companies and the relevant consolidated group financial statements.

Moving on to examine the overall statement of assets restated for the purposes of the arrangement with creditors, it is noted that the **assets** are composed of the following, taken from the updated version of the testimony:



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

---

| Moby SpA – Financial report (€100) | Adjusted balance 30.06.20 | % payment | Withdrawal | Total payments | 2021BP | 2022BP | 2023BP | 2024BP | 2025BP |
|---|---|---|---|---|---|---|---|---|---|
| **BoP cash** | | | | | **28,703** | **90,505** | **40,201** | **40,840** | **31,749** |
| Operating cash flow | | | | | 15,791 | 37,112 | 23,098 | 17,224 | 22,565 |
| Income from sale of ships | | | | | - | - | 94,294 | - | 38,457 |
| Income from sale of tugs branch | | | | | 50,000 | - | - | - | - |
| Income from sale of other assets | | | | | 6,302 | - | - | - | 4,813 |
| Provision pursuant to Article 89 of Decree Law 104/2020 | | | | | 6,700 | - | - | - | - |
| Increase in capital | | | | | - | 6,000 | - | - | - |
| Payments for Chinese ships | | | | | (11,816) | (38,600) | (7,460) | - | - |
| **Total liquidity at debt service** | | | | | **95,680** | **94,957** | **150,134** | **58,064** | **97,584** |

The plan provides for the sale of the **tugs branch** on which the witness points out that "*the significance of the cash flow in question for the purposes of covering the financial requirement planned for 2022 means that the failure to complete the sale of the tugs branch within the periods specified by the plan constitutes an independent point of failure thereof which will have to be monitored*" (page 29 of the testimony of 15.6.2021).

As correctly observed by the witness, the requirement for the arrangement for the year 2022 is based on resources deriving from the sale of the tugs branch; therefore, to enable the creditors to give their informed consent and to immediately check the feasibility of the plan, the process of sale of the branch will necessarily have to be finalized before the report is filed pursuant to Article 172 of the Bankruptcy Law (at least through the award) and the sale will have to be completed by the end of the current year and before the creditors' meeting.

This is in accordance with the provision of Article 182 of the Bankruptcy Law which, where it contemplates the applicability of Articles 105 to 108 ter of the Bankruptcy Law, insofar as they are compatible, to sales, assignments and transfers legally established after the filing of the application for an arrangement, clearly admits that the sale of the assets may take place prior to approval, or even on approval of the proposed arrangement.

In this respect, recalling the principles of competitiveness inherent in the system of the Bankruptcy Law, the company must, under the supervision of the commissioners, immediately commence the procedure for the sale of the asset comprising the tugs branch, by means of widespread advertising in that particular reference sector and, as indicated by the witness, by resuming due diligence activities on those persons that had already shown an interest therein.

In order to offer creditors all useful information, it should be noted that the company has stipulated in the plan, as amended, that the sums deriving from the sale of that branch should be deposited into an escrow account until the possible approval of the arrangement.

In fact, in the original version of the plan, the company *subjected* the sale of the tugs branch to the immediate cancellation of the mortgages existing thereon.

In the ruling of 3.5.2021, the Court noted that although, on the one hand, a combined reading of the reference provisions allows the mortgages to be cancelled even prior to approval of the arrangement (and even before the creditors cast their votes), in such cases, by a similar application of Article 111-*ter* of the Bankruptcy Law, it seems advisable for the sums obtained from the sale of the assets to be deposited in an escrow account on the Court's order, and not to be combined with the assets of the company subject to the arrangement until the possible

*Page 14*



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

approval, particularly in cases where, when business is planned to continue, the risk that the sums resulting from the sale of the assets subject to the pre-emptive right will be combined with the general mass of liquidity, removed from the original, associated purpose of paying off the preferential creditors, is even more apparent.

With regard to the assets formed by the **cash flow of the going concern**, in the ruling of 3.5.2021 the Court raised numerous points, based on the criticisms emerging from the analysis made by the preliminary commissioners, on the feasibility of the plan, pointing out how, briefly, following a considerable contraction of the fleet and the resulting reduction in routes, an increase in revenues was anticipated over the timespan of the plan compared to the revenues earned in the year 2019, an increase also deriving from an increase in tariffs and a reduction of bunker costs.

The uncertainties over the actual amount of revenues achievable based on the company's assumptions were partly confirmed by the witness himself in the first supplementary report where he noted that he had made an analysis of the current trading with regard (i) to turnover, costs and EBITDA for the period January-February 2021 and (ii) to passenger and goods revenues in the period January 2021-19 April 2021, comparing the overall "monthly" figures with those of the plan for the same period, indicating a negative trend both of passenger revenues and of goods revenues compared to that indicated by the plan.

In the supplement dated 15.6.2021, the witness once again made an in-depth analysis of current trading, pointing out the differences compared to the plan forecasts of overall passenger and goods turnover in May 2021 compared to the same period of the plan, as shown in the table below:

**PAX revenues – Moby**

| €K | May 2021 (ytd) |
|---|---|
| Current revenues | 5,854 |
| Plan revenues (11 June version) | 11,095 |
| Delta | -5,240 |
| % difference from Plan | -47% |

**GOODS revenues – Moby**

| €K | May 2021 (ytd) |
|---|---|
| Current revenues | 11,843 |
| Plan revenues (11 June version) | 13,039 |
| Delta | -1,196 |
| % difference from Plan | -9% |

The table above shows a significant difference compared to the plan forecasts with regard to passenger revenues; the witness points out, however, that this difference appears to be smaller than the difference in the month of April. With regard to goods revenues, the May figures indicate a delay in relation to that forecast by the plan by a total of €1.2 million (-9%).



**COURT OF MILAN
SECOND CIVIL DIVISION**

_____

With regard to passenger revenues, the witness also examined the bookings as at 13.6.2021, which indicate a clear improvement on the bookings compared to 2020 but lower than in 2019, stating that "*With regard to passenger travel, however, "after 13 June", (actual travel forecasts irrespective of bookings, editor's note) the Moby management forecast overperformance compared to both 2019 (+36%) and 2020 (+30%).*
Details of the analysis of "passenger revenues" are provided in the table below.

| Passengers (€K) | Jan 19 | Feb 19 | Mar 19 | Apr 19 | May 19 | Jun 19 | Jul 19 | Aug 19 | Sep 19 | Oct 19 | Nov 19 | Dec 19 | FY 2019 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Travelled | | | | | Booked/to go | | | | | | | | | |
| Travelled to 13/6 | 1,392 | 960 | 1,508 | 4,490 | 4,816 | - | - | - | - | - | - | - | 13,165 | | |
| Booked to 13/6 | - | - | - | - | - | 13,350 | 12,968 | 17,710 | 4,159 | 696 | 8 | 3 | 48,894 | | |
| Travelled after 13/6 | - | - | - | - | - | 2,343 | 8,668 | 20,294 | 10,281 | 3,993 | 1,163 | 1,551 | 48,295 | | |
| Other (cancellations, exchanges, etc.) | 10 | (31) | (14) | 35 | 52 | 319 | 432 | 818 | 351 | 58 | 1 | 14 | 2,045 | | |
| **Total** | **1,402** | **929** | **1,494** | **4,525** | **4,868** | **16,012** | **22,068** | **38,822** | **14,792** | **4,747** | **1,172** | **1,569** | **112,399** | | |
| Passengers (#) | 56,439 | 43,487 | 67,449 | 152,653 | 174,293 | 380,827 | 510,536 | 662,068 | 358,206 | 157,423 | 52,254 | 55,730 | 2,671,365 | | |
| Average tariff (€/#) | 24.8 | 21.4 | 22.2 | 296 | 27.9 | 42.0 | 43.2 | 58.6 | 41.3 | 30.2 | 22.4 | 28.1 | 42.1 | | |

| Passengers (€K) | Jan 20 | Feb 20 | Mar 20 | Apr 20 | May 20 | Jun 20 | Jul 20 | Aug 20 | Sep 20 | Oct 20 | Nov 20 | Dec 20 | FY 2020 | % 19-20 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Travelled to 13/6 | 1,440 | 974 | 357 | 24 | 287 | - | - | - | - | - | - | - | 3,082 | -77% | |
| Booked to 13/6 | - | - | - | - | - | 3,178 | 5,240 | 7,276 | 2,460 | 563 | 6 | 2 | 18,725 | -62% | |
| Travelled after 13/6 | - | - | - | - | - | 1,751 | 9,710 | 27,228 | 8,083 | 2,606 | 561 | 669 | 50,607 | 5% | |
| Other (cancellations, exchanges, etc.) | (2) | 21 | 75 | 10 | (36) | (47) | 119 | 389 | 148 | 18 | (14) | (6) | 675 | -67% | |
| **Total** | **1,438** | **995** | **432** | **34** | **251** | **4,881** | **15,070** | **34,893** | **10,691** | **3,187** | **553** | **664** | **73,089** | **-35%** | |
| Passengers (#) | 50,397 | 39,054 | 11,612 | 9 | 6,317 | 103,356 | 315,877 | 556,515 | 236,392 | 85,448 | 16,769 | 17,441 | 1,439,187 | | |
| Average tariff (€/#) | 28.5 | 25.5 | 37.2 | 3,803.4 | 39.7 | 47.2 | 47.7 | 62.7 | 45.2 | 37.3 | 32.9 | 38.1 | 50.8 | | |

| Passengers (€K) | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | FY 2021 | % 19-21 | % 20-21 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Travelled to 13/6 | 624 | 723 | 762 | 914 | 2,901 | - | - | - | - | - | - | - | 5,923 | -55% | 92% |
| Booked to 13/6 | - | - | - | - | - | 7,094 | 10,635 | 13,039 | 2,838 | 344 | 2 | 0 | 33,952 | -31% | 81% |
| Travelled after 13/6 | - | - | - | - | - | 9,644 | 13,217 | 26,528 | 11,482 | 2,358 | 951 | 1,461 | 65,641 | 36% | 30% |
| Other (cancellations, exchanges, etc.) | (3) | (11) | (17) | (38) | - | - | - | - | - | - | - | - | (69) | -103% | -110% |
| **Total** | **621** | **711** | **744** | **876** | **2,901** | **16,738** | **23,852** | **39,567** | **14,319** | **2,702** | **954** | **1,462** | **105,448** | **-6%** | **44%** |
| Passengers (#) | 15,471 | 18,655 | 19,807 | 25,256 | 70,117 | 352,844 | 484,330 | 613,069 | 294,955 | 116,287 | 49,678 | 59,916 | 2,120,86 | | |
| Average tariff (€/#) | 40.2 | 38.1 | 37.6 | 34.7 | 41.4 | 47.4 | 49.2 | 64.5 | 48.5 | 23.2 | 19.2 | 24.4 | 49.7 | | |

In their opinion filed, the Judicial Commissioners indicate the weakness of the margins of resistance to negative variations, pointing out that the turnover from passenger travel between June and December 2021 "*is estimated at a total of €65,641K, compared to an overall figure of €50,607K in 2020 and €48,295K in 2019*".
The witness reports the following sensitivity scenario, anticipating a reduction in revenues in an amount equal to €15 million, reaching the conclusion that such a contraction would be sustainable up to 2024:
"*The Plan shows significant robustness for the first two years. In particular, the breaking threshold for Plan year 2022 is based on lower average tariffs than the overall figures in 2019 (and therefore significantly lower, by around 13%, than the figures for 2020);*
*The Plan years between 2023 and 2025, however, show greater weakness, mainly in view of the reduced liquid assets, which take into account the corrections to the cash flow made by the undersigned, connected with the insolvency debt service. In the years in question, the breaking threshold of the plan is based on gradually increasing average tariffs between 8% and 2% lower than the Plan;*

*Page 16*



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

*If the average tariffs are placed at 2019 levels (average figure of around €42, that is around 11% lower than the Plan figure and around 17% lower than the 2020 figure), the Plan would not be financially sustainable as from 2023".*

The table of assets identifies the cash flows intended to pay for the "**Chinese ships**" whose payment falls within the scope of a complex transaction aimed at the acquisition by MOBY of shares in the company F.lli Onorato Armatori S.r.l., the company that commissioned the construction thereof.

According to the company's reasoning, the transaction involving the so-called "Chinese ships" "*derives from the need to strengthen and consolidate the Onorato Group's position (and that of the Company, in particular) on the market and, at the same time, to anticipate and respect all the legislative constraints regarding the environment laid down by the national and international legislation. The inclusion of the so-called Chinese ships in the fleet makes it possible to improve the efficiency of the fleet and to sell off the ships considered to be most out-of-date, requiring higher maintenance costs. In particular, the Plan provides that, over the course of 2023, simultaneously with the delivery of the Chinese ships, the motorboats "Moby Aki", "Moby Wonder", "Giuseppe Savarese" and "Pietro Manunta" will be sold, for an amount of over €94 million. From an economic point of view, the Company has estimated that, benefiting from the greater carrying capacity made available by the Chinese ships, the greater efficiency of consumption and, at the same time, the cost savings compared to the ships placed on sale over the course of the Plan, higher EBITDA of around €3 million may be achieved*".

According to the company's reasoning, the inclusion of the Chinese ships aims to offset the substantial contraction of the fleet through the planned sales and to therefore replace the ships sold with ships which the companies assumes to be characterized by a greater carrying capacity and therefore more efficient than the ships it is planned to sell.

However, the company has not offered an adequate representation of the risks deriving from a delay in the delivery of the ships or from the more serious case of non-delivery of the ships owing to termination of the related underlying deals (a risk which, while considered to be remote by the company, the witness points out on page 57 of the original testimony) and the resulting economic effects on the cash flow of the going concern (and on the resulting feasibility of the plan), any necessary assessment of the economic impact of the points of criticism raised on the feasibility of the plan having to be referred to the commissioners.

On this point, the Court recalls the commissioners' duties of vigilance and monitoring and, in accordance with the witness's reasoning, points out the fundamental need for the company subject to the arrangement to have an independent CRO (Chief Restructuring Officer) in order to implement recovery measures in the event of differences in the forecasts underlying the arrangement plan, as will be dealt with in greater detail below.

As is clear to the witness himself, the foregoing data indicates the need to update the plan in any event in order to align MOBY's and CIN's individual plans, even following the filing of the application for an arrangement with creditors by the latter.

On this point, the witness states that "*the business plan preceding MOBY's and CIN's restructuring plans had been initially designed based on a single "shipping business", relating to the fleet of both companies, in accordance with the procedures with which the Group planned to use the ships. In May 2021, the management updated the shipping business, only incorporating the effects thereof into CIN's Plan, which was in the process of finalization in view of the filing of the plan and the proposed arrangement with creditors for which the undersigned had issued a statement on 11 June last. A similar update was not made for Moby, however. For that reason, as things stand, Moby's and CIN's two individual plans are not aligned with regard to the shipping business and macro assumptions, particularly with regard*

*Page 17*



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

*to the impact of Covid on 2021 and the trend of the bunker curve, which the undersigned dealt with within the scope of the analysis of the relevant breaking points. Further details on the update of the shipping business do not, however appear to have a negative impact on the cash flows of Moby's current plan*".

The table of assets indicated above includes the **contribution of €6,000,000.00 made by Vincenzo Onorato** personally and in his capacity as sole shareholder and legal representative of Onorato Armatori S.r.l., who, with the statement sent to the appellant on 19.5.2021 (exhibit 182), stated that, "*in order to strengthen the generation of cash flows and in full knowledge of the sacrifices requested of Moby's company creditors [...], for the purposes of and subject to the correct outcome of the Arrangement with Creditors [...], he henceforth assumes the irrevocable undertaking to pay, within 6 months of the issue, by the Court of Milan, of the ruling on the final approval of the Arrangement with Creditors, a personal contribution to Moby and its creditors, observing the legitimate pre-emptive rights thereof, in an amount equal to a total of €6,000,000.00*", stipulating that the efficacy of such contribution commitment "*is subject to the issue, by the Court of Milan, of the ruling on the final approval of the Arrangement with Creditors*" (the "Onorato Contribution").
The plan and the statement point out that:
- The contribution is no longer intended for the class 1 and 2 creditors in return for their possible waiver of the pledge on the MOBY shares, but is intended for all company creditors;
- In order to obtain the resources to make that contribution, "*the shareholder or other members of his family shall confer an irrevocable mandate for admission of the arrangement on a primary market operator for the sale of a significant portion of the property assets available to the shareholder, who shall irrevocably undertake to pay any income, net of expenses, deriving from the sale of such property assets to Onorato Armatori Srl and therefore to Moby, up to an amount of €6m*".
It should be noted that the witness does not take this contribution into account for the purposes of the feasibility opinion as the commitment is subject to the definitive nature of the ruling on approval and is exposed to the risk of revocation by the shareholder's personal creditors.
The Court notes on this point that the shareholder's declaration of wishes should be amended in order to make the content thereof reliable and specific, with regard to timing and procedure.

The assets indicated in the table factor the amount of €6.7 million through the effect of **access to the provision allocated pursuant to Article 87 of Decree Law No. 104/2020**, intended to offset the reduction in passenger traffic for maritime companies as a result of the Covid-19 pandemic.
In this respect, the commissioners should check the accuracy of the estimate made and the prospects of the actual provision of the contribution.

The liabilities indicated in the statement are briefly identified as follows:



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

*Thousands of euros*

| Debt | Relevant debt | Pre-deductions | Preferential debts | Unsecured debts | Deferred debts |
|------|---------------|----------------|--------------------|-----------------|----------------|
| Equity | - | - | - | - | - |
| Provisions for risks and expenses | 175,609 | 11,515 | 26,343 | 137,751 | - |
| Severance payments | 108 | - | 108 | - | - |
| Bonds | 320,682 | - | 320,682 | - | - |
| Bank payables | 165,723 | - | 162,999 | 2,724 | - |
| Advances | 16 | - | - | 15 | - |
| Trade payables | 41,273 | - | 7,677 | 33,596 | - |
| Intercompany payables | 69,666 | - | - | 35 | 69,630 |
| Tax payables | 4,388 | - | 4,388 | - | - |
| Social security payables | 2,882 | - | 2,822 | - | - |
| Other payables | 970 | - | 943 | 28 | - |
| Accrued expenses and deferred income | - | - | - | - | - |
| **Total** | **781,256** | **11,515** | **525,962** | **174,149** | **69,630** |

Suitable provisions for risks have also been set aside following the witness's involvement.
The table containing the liabilities indicates the intra-group debts as deferred. The commissioners will have to carry out the aforesaid checks on this point.
The commissioners should assess the adequacy of the provision for risks set aside in the amount of €4,000,000 for unsecured claims for the penalty, to be (re)determined by AGCOM based on the recent Council of State decision, owing to abuse of a dominant position established in breach of Article 102 of the Treaty on the Functioning of the European Union.

Pursuant to Law 132 of 2015, the proposal should indicate the benefit specifically identified and economically assessable which the proposer undertakes to provide for each creditor.
In this specific case, the benefit is indicated as a pecuniary payment whose percentage guaranteed in the statement is identified as the minimum amount indicated by the company in relation to which the professional appointed expressed his opinion on the best satisfaction of creditors. The report of the professional competent to be appointed administrator pursuant to Article 28 of Law No. 5 of 2006 certifies the veracity of the data forming the basis of the proposal, having carried out checks that appear to be of the standard required by best practices, and having renewed the aforesaid checks following the drafting of the new version of the proposal.
The report was apparently drawn up correctly, particularly with regard to the check on the veracity of the accounts and data forming the basis of the statement of assets (also subject to continuous checking and update), which did not present any irregularities such as to affect the reliability of the plan proposed.
The report currently appears to be analytical, exhaustive and coherent in the light of the logical argument forming the basis of the statement of feasibility of the plan and the methodology adopted in the checks performed in order to certify the veracity of the accounting data provided by the company.
In particular, since this is an arrangement on a going concern basis, the arguments put forward to support the functionality of the continuation of business forming the basis of the arrangement plan on a going concern basis in relation to the **creditors' best interests** appear to be adequately illustrated by the witness, who points out that the specific comparative scenario comprises **extraordinary administration proceedings**.
As it is known, the interest protected as a priority by the extraordinary administration should be identified in the preservation of the production assets, that is the business complexes in operation and not the debtor's assets considered in themselves.



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

The protection of the production complexes as such together with the maintenance of jobs, forming the heart of the rules on extraordinary administration, constitute what has been defined as a "Copernican reversal" of the scale of values protected in the arrangement with creditors, however.

Consider, for example, the provision laid down in Article 63 of Law No. 270/199 according to which, in the sale of "going concerns", the sale price must take into account the profitability, even if negative, not only at the time of the estimate but also in the following two-year period. Article 55 of Legislative Decree No. 270/1999 then points out the requirement to safeguard business complexes in the operating unit while, with regard to the creditors' interest, the rule provides that such interest should simply be "taken into account", confirming its inescapable recessive nature in relation to the prevailing interests taken into consideration by the legislation.

In Article 186 bis of the Bankruptcy Law, however, both the continuation of business activities by the debtor and the sale of the going concern to third parties must be functional _to the best satisfaction of the creditors,_ the outcome of which depends on the vote of the creditors called upon to assess the advisability of a plan which must necessarily contemplate, on pain of invalidity of the specific cause of the arrangement, the plausible satisfaction of unsecured creditors in reasonable time; while extraordinary administration frequently witnesses a reduction even of pre-deductible claims with the resulting ranking thereof.

Article 186-bis, paragraph 2, letter b), of the Bankruptcy Law also requires the professional's report to contain, besides certification of the veracity of the company data and of the feasibility of the plan proposed, the functionality thereof, _to the best satisfaction of the creditors_. Similarly, authorization to contract pre-deductible loans requires the professional's certification that such loans are functional to the _best satisfaction of the creditors_ (and the same applies to the payment of previous creditors pursuant to Article 182-quinquies, paragraph 5, of the Bankruptcy Law).

Article 3, letter f, of Enabling Law No. 155/2017 also talks of the best payment of claims, specifically with regard to the insolvency of business groups, providing that, in the unitary management of the arrangement with creditors, the criteria must be established to draw up the unitary plan for resolving the group crisis, by means of intra-group business transactions, once again functional not only to business continuity but also to the _best satisfaction of the creditors' interests_.

Therefore, the arrangement with creditors, even in the case in question and despite the criticisms indicated above, appears to the Court, as things stand and without prejudice to any different comparative assessments referred to the commissioners, to be the better feasible solution (compared to the extraordinary administration scenario) in order to offer the greatest protection to the body of creditors considered overall and not just to limited categories thereof. In any event, the commissioners should specifically assess alternative scenarios that (also) take into account the specific enforceability of actions for liability brought against the managerial body, the board of statutory auditors and the independent auditors.

The Court notes that the company has made a full disclosure of the reprehensible actions performed by the aforesaid persons by means of a broad assessment made by the witness based on a specific forensic check performed by Stefania Chiaruttini, aimed at identifying facts and transactions performed in respect of MOBY and CIN that may have proved detrimental to the company creditors and that in any event constitute a source of liability.

In his statement in particular, Riccardo Ranalli provides a summary of the evidence emerging with regard to:



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

1) Governance and internal aspects, noting the inadequacy of the management and control system, not sufficiently structured to guarantee the correct monitoring of certain sensitive activities, such as relations between related parties;

2) Refinancing transaction and LBO, specifically with regard to the reverse merger transaction performed in the year 2016 between Onorato Armatori S.p.a. and Moby, a transaction which, while involving just two group companies, was based on an underlying business plan in which the sustainability of the debt related to the cash flows generated by the entire group (and therefore by CIN as well), and not just by the companies involved in the transaction;

3) Transactions with CIN, closely connected with the aspects referred to in point 2), specifically with regard to the ticketing service provided on CIN's behalf by MOBY which, after directly collecting the revenues deriving from the ticket sales, did not reserve them in the subsidiary's funds; this aspect is linked to the reverse merger transaction of 2016, to which CIN remained extraneous but the sustainability of the debt was demonstrated and verified with regard to the cash flows generated by the group, giving rise to a situation of misalignment, which gave rise to the need to transfer CIN's receipts to MOBY with the resulting systematic drainage of the subsidiary's resources;

4) Relations between the company and the management body, with regard to: a) the amount of fees paid in the period 2015-2019 to members of the board of directors, in an amount exceeding the average fees paid by comparable national and foreign companies; b) economic relations between the company and several members of the board of directors with regard to the sale of properties by the latter to MOBY; c) advisory relations between the company and several members of the board of directors; d) substantial donations to political entities and parties.

The facts indicated above are set out in greater detail in the witness's report, which is available to creditors for them to form their own opinion.

These facts must be studied in full by the commissioners not only to check the specific enforceability of actions for liability in an alternative scenario but also to check whether the disclosure made by the company was complete and to, therefore, rule out the existence of hidden facts concerning the debtor's assets of a deceptive value with the ability to prejudice the creditors' informed consent on their real prospects of satisfaction.

In this latter event, the commissioners should immediately report to the Court in the manner laid down by law for the resulting orders.

The commissioners should therefore also examine the statement of assets of the company put forward with the proposed arrangement in order to check whether it actually corresponds to that actually existing based on an analysis of the complex intra-group relations and the relevant consolidated financial statements as well.

Any independent assessments which the Public Prosecutor's Office may carry out, in the possession of adequate documentary data, may not be prejudiced.

With this in mind, a radical change of governance appears to be an essential step, adequately indicated in the statement, to be made before the commissioners' final assessments. Such a change should be of such a nature as to guarantee for the body of creditors the absolute independence of the new governance which should be established as clearly separate from the current management.

The company, as strongly recommended by the witness as well, should also appoint a Chief Restructuring Officer, meeting the requirements of independence and with an in-depth knowledge of business recovery mechanisms, for the prompt ongoing monitoring of the

 **COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

feasibility of the plan and with the ability to immediately identify "*any differences between the objectives planned and those achieved, in the event of which substantial changes should immediately be made to the strategic intentions provided for in the plan and even to the use of a means of resolving any further crisis (para-arrangements with creditors in the form of a restructuring agreement pursuant to Article 182 bis) or, in particularly serious situations, any other means (recourse to extraordinary administration proceedings, if the requirements are met)*" (cf. statement dated 15.6.2021, page 46).

In the light of the foregoing considerations, the debtor may be admitted to an arrangement with creditors.

The complexity of the procedure calls for the appointment of a board of three commissioners rather than a single commissioner, with the double intention of improving the efficiency of the board, in proceedings characterized by the significant issues described above. This guidance is not excluded by law and is inspired by analogy to other cases and proceedings in which the judge may make use of technical management or liquidation boards (following the entry into force of Corrective Decree 169 of 2007, several liquidators may be appointed, for example, to carry out liquidation in an arrangement with creditors, while that has been possible for years in cases of extraordinary administration and in compulsory administrative liquidation).

The board of commissioners:

a) will decide by a majority, in the event of disagreement;
b) will exercise the powers of representation through at least two commissioners jointly;
c) will receive an overall fee equivalent to that of an individual commissioner (the tasks being performed according to the principle of the best and fastest organization of the work, and therefore not unnecessarily tripling the activities); one-third to be distributed to each commissioner.

Finally, one should assess the **application** with which MOBY requested authorization for an agreement with the subsidiary C.I.N. aimed at regulating the procedure for payment of the claim for charters arranged by C.I.N. accrued in respect of MOBY (and therefore a pre-deductible debt in the CIN proceedings).

The agreement provides for the deferral of payment of the sum of €9.3 million, payable by C.I.N. to MOBY at 31.1.2021 (of which €8.3 million for charters for the months of November and December 2020 and €1 million for charters for the month of January 2021) with payment being provided in two equal instalments on 31 August 20221 *[sic]* and 31 August 2023; this agreement being subject to the conclusion of the approval process and authorization by the Court.

The Court notes that, in view of the unstable relations between MOBY and CIN, no authorization may be given in these proceedings without the preliminary study requested of the commissioners (and also of CIN) on the overall relations between the parent company and subsidiary and as the application is not denoted by the requirement of urgency.

**ON THESE GROUNDS**

Having regard to Articles 160, 161, 163, 163-bis and 166 of the Bankruptcy Law

1) Declares the arrangement with creditors proposed by the company **MOBY S.P.A. [tax code 04846130633] with registered office at VIA LARGA N. 26, MILAN, OPEN;**
2) Assigns **Vincenza Agnese** to the proceedings;
3) Orders the meeting of creditors to be called before the delegated judge for **13.12.2021, at 10:00**, room B, first floor, Milan Law Courts, fixing a period of 30 days as from the



**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

date of this ruling to give notice of the date of the meeting, the ruling on the admission of corporate creditors, and the proposed arrangement with creditors;

4) **RECALLS**:

   a) that the report of the Judicial Commissioner pursuant to Article 172 of the Bankruptcy Law must be filed 45 days prior to the meeting at the registry and must be notified to the creditors;

   b) that votes received prior to the filing of the report will not be considered valid pursuant to Article 172 of the Bankruptcy Law, as such voting is incompatible with informed consent;

5) **RECALLS** that they must receive notifications pursuant to Law No. 221/2012 on the digital agenda, converted by Decree No. 179 of 2012[1];

6) **APPOINTS** as Judicial Commissioners:

   **PIERO CANEVELLI**
   **TIZIANA GIBILLINI**
   **MAURIZIO ORLANDO**

7) **ESTABLES** a period of 15 days as from notification for the appellant to deposit the sum of **€1,000,000**, equal to 20% of the costs presumed to be necessary for the entire proceedings, net of any expenses already paid during the stage referred to in Article 161, paragraph 6, of the Bankruptcy Law, by payment into the current account opened for the proceedings at the bank **INTESA SAN PAOLO S.P.A.**, clarifying that the remainder will be paid by the due date of the commissioner's opinion pursuant to Article 180 of the Bankruptcy Law;

8) **ORDERS** the company subject to the arrangement to immediately make the accounting documents available to the Judicial Commissioners for annotation referred to in Article 170 of the Bankruptcy Law;

9) **ORDERS** the company subject to the arrangement to hand over to the Judicial Commissioners, within 7 days of notification of this admission ruling at the latest, an electronic or analog copy of the mandatory accounting and tax documents, for the purposes referred to in Article 165, paragraphs 3 and 4; this ruling must be published and notified in the manner provided for by Article 166 of the Bankruptcy Law, and by insertion both on the website of the Court of Milan and in the newspaper IL SOLE 24 ORE; and the Judicial Commissioners must submit an extract of this ruling to the competent offices for inclusion in the public registers, pursuant to Articles 88 and 166 of the Bankruptcy Law;

10) **RECALLS**:

   - that, pursuant to Article 16-bis, paragraph 1, of Decree Law No. 179 of 18 October 2012, converted into law, with amendments, by Law No. 221 of 17.12.2012, as from 30 June 2014, *"in civil, litigation or voluntary jurisdiction proceedings before the Court, procedural and other documents may only be filed electronically by the defense counsels of the parties previously established"*; and that, therefore,

_____

[1] It is recalled that, following notification of the commissioner's certified email address to the Companies Register within ten days of the appointment, the notice should be drawn up pursuant to Article 171 of the Bankruptcy Law, which must contain:

   1) The date of the meeting;
   2) A full copy of the proposed arrangement with creditors and the ruling on admission;
   3) The commissioner's certified email address.

The invitation to each creditor to provide the certified email address at which it wishes to receive notices within a period of 15 days, and, only if it is not provided and cannot be found *aliunde* at the Companies Register, notification that notices will be filed at the registry with releasing effect.

**COURT OF MILAN**
**SECOND CIVIL DIVISION**

_____

subsequent documents (obviously not those attached) must be filed in PDF.doc format (native PDF file not scanned), possibly accompanied by a courtesy copy (complete with attachments) to enable the other members of the board to examine the application and attachments;

- that, in the event of failure to comply with this procedural obligation, the delegated judge will not examine the applications/statements before ordering the regularization thereof;
- The application is rejected pursuant to Article 161, paragraph 7, of the Bankruptcy Law.

Thus decided in Milan, *in camera*, by the Second Civil Division, on 24/06/2021.

Reporting Judge                                      President
*Vincenza Agnese*                                 *Alida Paluchowski*



100 Park Avenue, 16ᵗʰ Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK          )
                          )                    ss:
COUNTY of NEW YORK      )

### ***CERTIFICATE OF ACCURACY***

This is to certify that the attached document "12836476_1_Moby Decreto from the Tirbunale di Milano"-- originally written in *Italian* -- is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: 7/9/2021                                Sworn to and signed before ME
                                               This 9th day of July, 2021

*Susannah Smith*                               *James G Mamera*
Susannah Smith                                 Notary Public
Project Manager
Consortra Translations



JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022

Your
legal
translation
partner

---

New York, NY  |  Washington DC  |  Houston, TX  |  San Francisco, CA  |  Hong Kong